**RAG CUMBERLAND RESOURCES LP and RAG Emerald Resources LP, Petitioners,**

v.

**DEPARTMENT OF ENVIRONMENTAL PROTECTION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 5, 2004.
Decided Feb. 9, 2005.
Reargument Denied April 12, 2005.

---

Ralph Henry Moore, II, Pittsburgh, for petitioners.

Mary Martha Truschel, Asst. Counsel, Pittsburgh, for respondent. Claudia Davidson, Pittsburgh, for intervenor, United Mine Workers of America.

BEFORE: FRIEDMAN, Judge, and LEAVITT, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge LEAVITT.

RAG Cumberland Resources LP (Cumberland) and RAG Emerald Resources LP (Emerald) (collectively Petitioners) petition for review of a decision of the Environmental Hearing Board (Board) that granted summary judgment in favor of the Department of Environmental Protection (Department). This case involves a single issue of law: whether Petitioners' mine inspection procedures satisfy the requirements of Section 228(a) of the Bituminous Coal Mine Act (Act).[1] We disagree with the Board's determination that Petitioners violated the Act and reverse its order.

The facts are not in dispute. Petitioners operate underground bituminous coal mines in Greene County, Pennsylvania. Cumberland conducts its operations in three primary production shifts per day, seven days per week. These shifts commence at 7:00 a.m., 3:00 p.m. and 11:00 p.m., with approximately 100 workers entering the mine at the designated start times. Cumberland conducts pre-shift safety examinations within the three-hour period of time preceding the beginning of each primary production shift, or from 4:00 a.m. to 7:00 a.m., 12:00 p.m. to 3:00 p.m. and 8:00 p.m. to 11:00 p.m. Examinations are conducted by certified mine officials and include an extensive inspection for hazards from roof and rib conditions and methane gas. The examinations, which may take the full three-hour period to conduct, include all areas of the mine where workers are going to work or travel.

Cumberland also regularly schedules workers to enter the mine at times that do not coincide with the start times for the primary production shifts. For example, eight workers start at 8:00 a.m., Monday through Sunday, and 48 workers start at 9:00 a.m., Monday through Sunday. These workers include maintenance workers, belt conveyor personnel and personnel who work in the continuous miner development

---

1. Act of July 17, 1961, P.L. 659, 52 P.S. § 701–228.

sections. Cumberland does not conduct separate pre-shift safety examinations prior to the entry of workers at "odd" times because, in Cumberland's view, the pre-shift examination for each primary production shift covers the workers entering the mine at any time during that particular shift.

Emerald's operations are the same as Cumberland's except for variations in the operative starting times. The primary production shifts start each day at 12:00 a.m., 8:00 a.m. and 4:00 p.m. Emerald conducts pre-shift safety examinations during the three-hour period preceding those start times, but at no other times. Emerald also starts workers at "odd" times, such as 55 workers at 6:30 a.m., Monday through Sunday, and 17 workers at 1:30 p.m., Saturday and Sunday. Emerald's operators, like their counterparts at Cumberland, believe that the examinations conducted prior to each primary production shift cover the workers entering the mine at any time during the shift.

On March 18, 2003, the Department issued compliance orders to Petitioners advising them that they were in violation of Section 228(a) of the Act.[2] The Department ordered Petitioners to take one of three corrective actions: (1) modify shift sched-

ules to consolidate the entry of workers to the times for which pre-shift examinations are currently being conducted; (2) conduct additional pre-shift examinations for all shifts beginning at "odd" times; or (3) compress pre-shift examinations currently being performed so that those examinations fall within the three-hour period preceding the entry of workers on more than one shift. Reproduced Record at 5a, 6a (R.R. ____).

These orders were issued pursuant to Section 228(a) of the Act. It provides, in relevant part, as follows:

(a) In a gassy mine,[3] within three hours immediately preceding the beginning of a coal-producing shift,[4] and before any workmen in such shift, other than those who may be designated to make the examinations prescribed in this section, enter the underground areas of such mine, certified persons designated by the mine foreman of such mine to do so shall make an examination, as prescribed in this section, of such areas.... If such mine examiner in making his examination, finds a condition which he considers to be dangerous to persons who may enter or be in such area, he shall indicate such dangerous place by

2. The compliance order issued to Cumberland provided that:
  No mine examinations are being conducted of the Cumberland Mine within 3 hours immediately preceding the entry of mine workers into the mine at 8 a.m. and 9 a.m. Monday through Sunday and 2 p.m. Friday through Sunday and 12 p.m. Saturday through Monday contrary to the requirements of 52 P.S. Section 701–228(a).
  Reproduced Record at 5a (R.R. ____). The compliance order issued to Emerald stated that:
  No mine examinations are being made of the Emerald Mine within 3 hours immediately preceding the entry of mine workers into the mine at 6:30 a.m. Monday through Sunday and at 1:30 p.m. Saturday and Sun-

day contrary to the requirements of 52 P.S. Section 701–228(a).
  R.R. 6a.

3. A "gassy mine" is one in which methane gas has been detected in an amount of twenty-five one hundredths percent or more. Section 103(7) of the Act, 52 P.S. § 701–103(7). There is no dispute that Cumberland and Emerald operate gassy mines.

4. A "coal-producing shift" is defined as "[a] shift primarily intended for coal production rather than for purposes of construction, maintenance and housekeeping even though some coal production may be incident to such purposes." Section 103(22) of the Act, 52 P.S. § 701–103(22).

posting a "danger" sign conspicuously at a point which persons entering such dangerous place would be required to pass. No person, other than Federal or State mine inspectors, or the mine foreman or his assistant, or persons authorized by the mine foreman or his assistant to enter such place for the purpose of eliminating the dangerous condition therein, shall enter such place while such sign is posted.

... No person shall enter the mine until the mine examiners return to the mine office on the surface, or to a station location in the intake entry of the mine ..., and report to the mine foreman or the assistant mine foreman, by telephone or otherwise, and a written report made thereof by the person receiving the report, that the mine is in safe condition for the men to enter....

A second examination by the same or other mine examiner shall be made during working hours of every working place where men are employed, and a report of said examination shall be made in the mine examiner report book in the same manner as the first examination.

*No person on a non-coal producing shift* (other than a certified person designated under this paragraph) shall enter any underground area in a gassy mine, unless such area, which shall include all places on that particular split or air, has been examined as prescribed in this sub-

section within three hours immediately preceding his entrance into such area. 52 P.S. § 701–228 (emphasis added).

Cumberland and Emerald appealed the Department's compliance orders and the Board consolidated the matters for review. The Department filed a motion for summary judgment. The dispute between the parties centered on the meaning of the word "shift" in Section 228(a) of the Act. In the Department's view, a shift is best understood as a group of workers, while Petitioners argued that a shift is defined by a period of time. The Board granted summary judgment in favor of the Department on January 27, 2004.[5] It reasoned as follows:

> We detect no ambiguity of any significance in Section 228(a). The section unequivocally requires preshift examinations for coal-producing and non-coal-producing shifts. As discussed above, the effort to define shift as having two different, separate meanings is artificial. Whether one defines a shift by reference to the workers or the period of time that they work, the fact remains that separate groups of workers and/or separate blocks of time cannot be viewed as the same shift. Where a statute is clear, that [sic] is no need to engage in interpretation. Pa.C.S.A. § 1921(b) & (c); *Eagle Environment, L.P. v. DEP*, 833 A.2d 805, 808 (Pa.Cmwlth.2003).

Board Opinion at 9–10. By order dated March 12, 2004, the Board dismissed Petitioners' consolidated appeals. Petitioners now petition this Court for review.[6]

---

5. In its order, the Board indicated that it was not ruling on two of the grounds for appeal raised by Petitioners. Petitioners subsequently withdrew those grounds, prompting the Board to enter an order on March 12, 2004, dismissing the appeal. This resulted in the Board's January 27, 2004, order becoming final for purposes of our review.

6. Our review of the Board's grant of summary judgment is limited to determining whether

the findings of fact are supported by substantial evidence, whether an error of law has been committed, or whether constitutional rights have been violated. *Stoystown Borough Water Authority v. Pennsylvania Department of Environmental Protection*, 729 A.2d 170, 172 n. 2 (Pa.Cmwlth.1999). Summary judgment is appropriate when, after review of the record in the light most favorable to the nonmoving party, it is determined that no genuine issue of material fact exists and the

Petitioners argue that the Board erred in its interpretation of Section 228(a) of the Act by ignoring the specialized definition of "shift" in the industry, by confusing "coal-producing" and "non-coal producing" shifts and by ignoring historical administrative interpretations of the Act.

Looking first to the language of Section 228(a) itself, it requires an examination to be completed prior to the "beginning of a coal-producing shift," which is defined as follows:

A shift primarily intended for coal production rather than for purposes of construction, maintenance and housekeeping even though some coal production may be incident to such purposes.

Section 103(22) of the Act, 52 P.S. § 701–103(22). The definition of a coal-producing shift indicates that a "shift" embodies an activity rather than an individual or group of miners. This conceptualization is supported by the language in Section 228(a) that refers to "workmen in such shift" and, elsewhere, to a "person on a non-coal producing shift." These words support the conclusion that "shift" means a period of time, not a group of workers. At the least, "workmen in such shift" demonstrates that "workmen" and "shift" are separate concepts.

Although the Act defines "coal-producing shift," it does not define the term "shift." It is on this point that the parties differ. The lack of a definition of "shift" in the Act indicates that Section 228(a) is not "clear and free from all ambiguity," 1 Pa. C.S. § 1921(b), and the Board erred in concluding that the statutory language is unambiguous. Because of this ambiguity, we must apply the rules of statutory construction to discern the meaning of the term "shift." *Browning–Ferris v. Department of Environmental Resources*, 143 Pa.

Cmwlth. 243, 598 A.2d 1057, 1060 (1991) (applying same analysis where phrase "interested party" not defined in Board's enabling statute). Section 1903(a) of the Statutory Construction Act directs, in relevant part:

(a) Words and phrases shall be construed according to ... their common and approved usage; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning ... shall be construed according to such peculiar and appropriate meaning or definition.

1 Pa.C.S. § 1903(a).

The Department argues that the term "shift" has a common and approved usage that we may find in the dictionary, i.e., that a "shift" is defined by a group of workers. We disagree. The dictionary definition of a "shift" is

*a group of people who work* or occupy themselves in turn with other groups ... a change of one group of people (as workers or students) for another in regular alternation[;] *a scheduled period of work* or duty.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2095 (Merriam–Webster, Inc.2002) (emphasis added). The common usage of the word "shift" is of little value in resolving the present dispute. The references to a "scheduled period of work" as well as to "a group of people" only highlights the diametrically opposed views of the parties.

The crux of Petitioners' argument is that, in the coal mining industry, the term "shift" has acquired a specialized meaning, *i.e.*, a designated block of time. In their response to the Department's summary judgment motion, Petitioners offered considerable evidence to support their view,

---

moving party is entitled to judgment as a matter of law. *Mountain Village v. Board of*

*Supervisors, Longswamp Township*, 828 A.2d 411, 412 n. 3 (Pa.Cmwlth.2003).

including deposition testimony from the following individuals: Richard Stickler, Director of the Department's Bureau of Deep Mine Safety; Joseph Sbaffoni, Chief of the Department's Bureau of Deep Mine Safety since 1992; Marvin W. Gardner, a state mine inspector assigned to Emerald and Cumberland; and Andrew Paciga, also a state mine inspector assigned to Cumberland. In addition, Petitioners incorporated by reference the deposition testimony of John M. Gallick, Safety Manager at Emerald since 1993, and Robert A. Bohach, Manager of Health and Safety at Cumberland since 1995.[7] The Board virtually ignored the aforementioned evidence after deciding that Section 228(a) was unambiguous. This was error. When properly viewed in a light most favorable to Petitioners, as the non-moving party, this evidence supported their position.

Gallick and Bohach explained how underground coal mines are different from other industrial sites because of the logistical difficulties in transporting employees into and out of the mine. At Emerald, for example, approximately 103 hourly workers and ten to fifteen supervisors enter the mine at the start of each coal-producing shift. Gallick Affidavit ¶ 10; R.R. 110a. The coal seam is accessed primarily by one elevator that holds twenty-one to twenty-nine miners. Gallick Affidavit ¶¶ 5–6; R.R. 109a. Because a round trip of the elevator takes approximately four minutes, it may take thirty to fifty minutes for the miners to travel from the surface to the coal-producing sections of the mine. Gal-

lick Affidavit ¶ 7; R.R. 110a. In order to promote a more efficient operation, and because it is physically impossible for all miners working in a given coal-producing shift to enter the mine at the same time, Petitioners and other mine operators have historically scheduled maintenance workers and some coal-production personnel to start work at times other than the designated starting time of the coal-producing shift. Gallick Affidavit ¶¶ 18–19; R.R. 112a.[8] According to Gallick and Bohach, prior to 2003 it was accepted in the industry that a pre-shift examination was effective for the entire shift and that miners could enter the mine at any time during that shift without triggering the need for a new examination. Gallick Affidavit ¶ 21, Bohach Affidavit ¶ 21; R.R. 113a, 119a. Relying on this historical interpretation, Petitioners have never conducted separate pre-shift examinations for the workers entering the mines at times other than the designated start of the coal-producing shifts. Petitioners assert that their view is consistent with the language of Section 228(a), which refers to "workmen in a shift." The fact that workmen are in or on a shift indicates that they are part of a greater whole, which, in the case of Petitioners' continuous operations, is a coal-producing shift.

The Department's own representatives acknowledged that, since enactment of the Act in 1961, a pre-shift examination has been viewed as effective for the entire shift. Stickler Deposition Transcript at 18

---

7. Gallick and Bohach also submitted affidavits that summarized the cogent portions of their testimony.

8. Bohach also described Cumberland's use of "hot seat exchanges" during changes in production shifts. Under this scheme, members of the arriving production crew descend into the mine while the prior crew is still working at the face equipment. The miners accom-

plish their shift change at the work site without any interruption in mining operations. The result is that a primary production shift may last longer than eight hours and overlap with another shift depending upon the length of time it takes for the oncoming crew to travel through the mine to the working section and for the departing crew to return to the surface. Bohach Affidavit ¶ 8; R.R. 116a.

(Tr. ____); Sbaffoni Tr. 43–44; Paciga Tr. 37–38. They agreed that the operators of large mines must necessarily stagger the entry of workers during the three main production shifts, and that historically it has been standard procedure not to conduct separate pre-shift examinations for workers who enter the mine after the designated start time for the shift. Stickler Tr. 8–9; Gardner Tr. 43–44; Paciga Tr. 17–22. In other words, workers who enter the mine after the start of a shift, but during it, are considered part of that shift. All of the witnesses agreed that the Department's present interpretation of Section 228(a) is fundamentally different from its interpretation prior to 2003. They attribute this shift to the Board's decision in *United Mine Workers of America, et al., v. Department of Environmental Protection and Eighty Four Mining Company*, 2001 Pa. Envirn. LEXIS 73 (2001) (hereinafter *Eighty–Four*). Although the *Eighty–Four* decision is not binding on this Court, a brief discussion of the case is warranted.

In 2000, Eighty–Four Mining Company (EFMC) implemented a new "alternative schedule" under which the mine operated twenty-four hours per day, seven days per week, with miners working ten or twelve-hour shifts instead of traditional eight-hour shifts. EFMC requested a variance [9] from the requirements of Section 228(a) so that it could conduct pre-shift examinations on a regular time interval of every eight hours instead of within three hours immediately preceding the start of a coal-producing or non-coal producing shift.[10] The Department approved the variance and the miners' union appealed. The Board reversed, finding that "the evidence demonstrates that the variance, as applied to the alternative schedule in this particular case, *would not accord equal or greater protection to personnel and property.*" *Eighty–Four*, 2001 Pa. Envirn. LEXIS 73 at *2 (emphasis added).

As the emphasized text makes clear, the Board's conclusion was confined to the facts of *Eighty–Four*. There, the union proved to the Board's satisfaction that conducting safety examinations every eight hours when mine workers are working ten or twelve-hour shifts would have resulted in large numbers of miners entering the mine either before an examination was completed or hours after the last examination was completed. Thus, the Board concluded that EFMC's variance did not accord protection to personnel substantially equal to or in excess of the Act's requirements, as is required under Section 702 of the Act. Eighty–Four is not analogous to the case sub judice, where Petitioners are running three eight-hour primary production shifts with examinations before each of those shifts. More importantly, the Board in Eighty–Four did not consider the meaning of "shift" in the Act, and the decision in no way altered the accepted view in the industry that a pre-shift examination is effective for the entire shift and that miners may enter the mine at any

---

**9.** EFMC requested the variance under Section 702 of the Act, which provides, in relevant part: "Nothing in this act shall be construed to prevent the adoption or use by any operator of new ... methods and processes, if such new ... methods and processes accord protection to personnel and property substantially equal to or in excess of the requirements set forth in any portion of this act." 52 P.S. § 701–702.

**10.** EFMC's variance would have essentially implemented the federal standard for pre-shift examinations in lieu of the requirements of Section 228(a). Federal regulations require examinations to be conducted "within three hours preceding the beginning of any 8–hour interval during which any person is scheduled to work or travel underground." 30 C.F.R. § 75.360(a)(1).

time during a shift without triggering the need for a new examination.

Nevertheless, after the Eighty–Four decision the Department asserted for the first time that an additional examination must be performed for miners that enter the mine after the shift designated by the operator has started. Stated otherwise, the Department believes that each miner is a "shift" for which an examination of the entire mine must be completed. Under the Department's order, the entry of even one miner at a time other than a designated start time requires a pre-shift examination of the entire mine.

■ The Department's "new" interpretation of Section 228(a) is contrary to the peculiar and appropriate meaning of "shift" that has developed in the coal-mining industry.[11] It also leads to absurd results. For example, a miner may need to return to the surface during his shift to retrieve a piece of equipment. Under the Department's interpretation, it is safe for this miner to re-enter the mine, but it is not safe for another miner, who is clocking in, to join the first miner to assist him with the equipment. The mine is either safe for both workers or it is safe for neither one. The Department does not

contend that doing full mine inspections more frequently than every eight hours will enhance safety in a significant way.[12] Although miner safety is certainly of paramount importance, we do not believe the legislature intended to transform the very purpose of a coal mine from coal production to mine inspection. The Department's scheme of virtually never-ending inspections is not sustainable.

■ In conclusion, we agree with Petitioners that the term "shift" has acquired a specific meaning in the coal-mining industry and the legislature used that special meaning here. For purposes of the Act, "shift" refers to a block of time and not to the entry of a worker or group of workers into a mine. The pre-shift examination conducted by Petitioners prior to the designated start time of each of their primary production shifts effectively covers any workers who enter the mine during that shift. Because Petitioners were not in violation of Section 228(a) of the Act, the Board erred in dismissing their appeal and in granting summary judgment in favor of the Department.

Accordingly, the order of the Board is reversed.

---

11. We recognize that a reviewing court will ordinarily defer to an agency's interpretation of a regulation or a statute it is charged to enforce. *Department of Environmental Protection v. North American Refractories Company,* 791 A.2d 461, 464 (Pa.Cmwlth.2002) (regulations); *Bethenergy Mines Inc. v. Department of Environmental Protection,* 676 A.2d 711, 715 (Pa.Cmwlth.1996) (statutes). Any deference we owe to the Department in this case must yield to Petitioners' considerable evidence that the Department's "new" statutory interpretation is an abrupt *volte face* from the interpretation it had followed for more than thirty years. *See Pennsylvania School Boards Association, Inc. v. Public School Employees' Retirement Board,* — Pa. —, —, 863 A.2d 432, 441 (2004) (acknowledging that an agency's reversal of a

decades-old interpretive position "might affect the level of deference this Court would otherwise accord the administrative interpretation."). Here, the Department's own representatives admitted that, historically, (1) a "shift" in the coal mining industry means a period of time rather than a group of workers, and (2) a pre-shift safety examination is effective for the entire shift and covers any workers who enter the mine after the designated start time. Deference is not appropriate here.

12. Notably, the Department did not develop a record to show that additional examinations before each miner enters the work site will greatly enhance safety or that current practices are inadequate.

## ORDER

AND NOW, this 9th day of February, 2005, the orders of the Environmental Hearing Board dated January 27, 2004, and March 12, 2004, in the above-captioned matter, are hereby REVERSED.

DISSENTING OPINION BY Senior Judge FLAHERTY.

I respectfully dissent. The question before this Court is solely a question of law: Whether Petitioner violated Section 228(a) of the Bituminous Coal Mine Act (BCMA), Act of July 17, 1961, *as amended,* P.L. 659, 52 P.S. § 701–228. Section 228(a) governs when pre-shift inspections of mines must be conducted and provides, in relevant part, that:

> (a) In a gassy mine, *within three hours immediately preceding the beginning of a coal-producing shift,* and before any workmen in such shift, other than those who may be designated to make the examinations prescribed in this section, enter the underground areas of such mine, certified persons designated by the mine foreman of such mine to do so *shall make an examination, as prescribed in this section,* of such areas.... If such mine examiner in making his examination, finds a condition which he considers to be dangerous to persons who may enter or be in such area, he shall indicate such dangerous place by posting a "danger" sign conspicuously at a point which persons entering such dangerous place would be required to pass. No person, other than Federal or State mine inspectors, or the mine foreman or his assistant, or persons authorized by the mine foreman or his assistant to enter such place for the purpose of eliminating the dangerous condition therein, shall enter such place while such sign is posted.
>
> . . .

A second examination by the same or other mine examiner shall be made during working hours of every working place where men are employed, and a report of said examination shall be made in the mine examiner report book in the same manner as the first examination. No person on a *non-coal producing shift* (other than a certified person designated under this paragraph) shall enter any underground area in a gassy mine, unless such area, which shall include all places on that particular split or air, *has been examined as prescribed in this subsection within three hours immediately preceding his entrance into such area.*

52 P.S. § 701–228 (emphasis added). On appeal, Petitioner argues that the Board misinterpreted Section 228(a) of the BCMA, that it failed to consider the peculiar and appropriate definition of the term "coal producing shift" and that it failed to consider DEP's historical administrative interpretation of Section 228(a).

The effect of the Board's interpretation of Section 228(a) is that Petitioner must do additional complete preshift examinations for workers who enter the Cumberland and Emerald mines during the shift for which an examination was already conducted. Petitioner argues that whether or not the Board erred hinges on what is meant by the term "shift", which is not defined in the BCMA. In its brief, Petitioner argues that: "If the start of the "shift" means the designated time when the coal-producing crews enter the mine, no violations of Section 228(a) existed. If it means the start of any individual's work period, the Board may be upheld." Petitioner asserts that the Board erred when it "rejected an interpretation of Section 228(a) that focused on blocks of time as a shift but instead held that a shift was a group or individual worker working a designated period of

time." The crux of Petitioner's argument is that, in the coal mining industry, the term "shift" has acquired a specialized meaning, which is that a shift is a designated block of time. Petitioner states that "[t]he reason for this is simple; it takes time for miners to travel in the mine. It cannot be done all at once." This is consistent with the language of Section 228(a), which refers to "workmen *in* a shift ... The fact that workmen are *in* or *on* a shift indicates that they are part of a greater whole, which is the coal producing shift."

DEP argues that Section 228(a) expressly requires pre-shift examinations and that Petitioner is admittedly not conducting mine inspections before some shifts. In the alternative, DEP argues that, in the event the term "shift" is unclear, its interpretation of the meaning of that term is reasonable and should be given deference—DEP's position is that "shift" is best understood as the group of workers rather than as a period of time. In addition, the United Mine Workers of America (Intervenor) agrees with DEP. Intervenor believes that timely pre-shift examinations are important to ensure the safety of the workers entering the mine.

When a statute can be reasonably interpreted in two different ways, we are obligated to give great deference to the agency's interpretation. *Bethenergy Mines Inc. v. Department of Environmental Protection*, 676 A.2d 711, 716 (Pa.Cmwlth. 1996). *See also* 1 Pa.C.S. § 1921(c)(8). This rule has particular application in this case where the very lives of coal miners are at stake. We are not interpreting "shifts" in the sense of occupations less at risk when inspections are required, such as, restaurant employees, assembly line employees, etc. We are being asked to interpret shifts in a highly specialized high risk occupation in the bowels of the earth

where the agency's expertise invites great deference.

The Statutory Construction Act also provides that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S.A. § 1921(b). In this case, the term "shift" is not defined in the BCMA. I agree with the Board that the term "shift" in Section 228(a) is clear and unambiguous and that DEP correctly applied this term. As such, I agree with the Board and DEP that when different groups of workers enter a mine at different times, it is clear that these workers are on a separate "shift." Because Petitioner is sending different groups of miners into its mines at different times, it must conduct a pre-shift inspection before those workers enter the mine because Section 228(a) clearly requires such an examination. Because Petitioner was not conducting these inspections, I do not believe that Board erred in concluding that Petitioner was not in compliance with the mandates of Section 228(a). If the conduct of inspections as required by Section 228(a) is burdensome, then it is the job of the Legislature, not this Court, to make the necessary changes. Furthermore, even if we accept Petitioner's argument that the term "shift" is not clear, I believe that we should give deference to DEP's interpretation of that term because it is the agency charged with keeping mines in this Commonwealth safe for the people who work in those mines.

Accordingly, I would affirm the Board's order.