**CASH AMERICA NET OF NEVADA, LLC, Petitioner**

v.

**COMMONWEALTH of Pennsylvania, Department of Banking, and the Honorable Steven Kaplan, in his official capacity as Secretary of Banking of the Commonwealth of Pennsylvania, Respondents.**

Commonwealth Court of Pennsylvania.

Argued April 1, 2009.

Decided July 10, 2009.

David H. Pittinsky, Alan S. Kaplinsky, and Raymond A. Quaglia, PA, for petitioner.

Carter D. Frantz, Harrisburg and Robert L. Byer, Pittsburgh, for respondents.

BEFORE: LEADBETTER, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, LEAVITT, Judge, and BUTLER, Judge.

OPINION BY Judge SMITH–RIBNER.

This case filed in the Court's original jurisdiction concerns the reach of Pennsylvania's usury laws in regard to "payday" loans that are made solely by means of the Internet. The Supreme Court has explained: "Payday loans are short-term, high-interest-or-fee loans that are generally secured by a post-dated check or a debit authorization executed by the borrower and, subsequently, presented by the lender after a predetermined period, usually set at two weeks to coincide with the borrower's payday." *Pennsylvania Department of Banking v. NCAS of Delaware*, LLC, 596 Pa. 638, 641, 948 A.2d 752, 754 (2008). The lending company has no office and no personnel physically present in Pennsylvania.

I

On July 26, 2008, the Secretary of Banking Steven Kaplan published in the

Pennsylvania Bulletin a "Notice to those Engaging or Considering Engaging in Nonmortgage Consumer Lending to Pennsylvania Residents," 38 Pa. B. 3986 (2008) (Notice). The Notice advised interested persons that it is "the position of the Department of Banking (Department) that engaging in nonmortgage consumer lending to Pennsylvania residents by any means, including by means of the internet or by mail, constitutes engaging in such business 'in this Commonwealth' as contemplated by section 3.A of the Consumer Discount Company Act (CDCA), [Act of April 8, 1937, P.L. 262, *as amended*] (7 P.S. § 6203.A)." *Id.* Section 3.A provides:

A. [N]o person shall engage or continue to engage in this Commonwealth, either as principal, employe, agent or broker, in the business of negotiating or making loans or advances of money on credit, in the amount or value of twenty-five thousand dollars ($25,000) or less, and charge, collect, contract for or receive interest, discount, bonus, fees, fines, commissions, charges, or other considerations which aggregate in excess of the interest that the lender would otherwise be permitted by law to charge if not licensed under this act on the amount actually loaned or advanced, or on the unpaid principal balances when the contract is payable by stated installments except a domestic business corporation organized under or existing by virtue of the [Business Corporation Law of 1988(BCL), 15 Pa.C.S. §§ 1101–4161], after first obtaining a license from the Secretary of Banking of the Commonwealth of Pennsylvania in accordance with the provisions of this act.

A person licensed is authorized to negotiate and to make loans under the rates, terms and conditions contained in the CDCA, which can be higher.

The Notice advised that non-depository entities engaged in making such loans at more than 6% that are not already licensed must be licensed by February 1, 2009. Entities that wish to become eligible to engage in such lending must obtain a license. The Notice explained that the Department took the position in prior Interpretive Letters that a non-depository entity without offices of any kind in Pennsylvania or people physically present here and acting on behalf of the entity as principal, employee, agent or broker was not engaged in business "in this Commonwealth" within the meaning of Section 3.A and would not be required to obtain a license. With the rise in Internet-based lending activity it became clear to the Department that Pennsylvania consumers were "being exposed to the very lending practices that the CDCA was enacted to protect them from." 38 Pa. B. at 3987. The Department therefore determined that its previous position would no longer be followed and that licensing would be required for all such lenders, with a transition period requiring licensing by February 1, 2009.

Cash America Net of Nevada, LLC (Cash America) filed its petition for review in the nature of a complaint in equity on January 8, 2009 seeking to have the Notice declared unlawful and to enjoin Respondents from implementing or enforcing it. It averred that it is a limited liability company existing under the laws of Delaware and that it is qualified to do business in Nevada. Further, it has no personnel physically present in Pennsylvania acting as principal, employee, agent or broker and has no office of any kind in Pennsylvania. It characterized the Notice as a binding norm setting forth a bright-line non-discretionary rule.

In Count One of its petition Cash America requested a declaration that im-

plementation and enforcement of the Notice constitutes un-promulgated rulemaking in violation of Pennsylvania law, and it sought an injunction against enforcement until the Department complied with requirements for promulgating a new regulation. In Count Two Cash America requested a declaration that an out-of-state company with no office of any kind in Pennsylvania or people physically present here acting as principal, employee, agent or broker is not engaged in business "in this Commonwealth" as that term is used in Section 3.A; that implementation and enforcement of the Notice violates the plain language of the CDCA; and that the Department be enjoined from applying the Notice to out-of-state lenders that are not physically present in Pennsylvania. Count Three sought a declaration that implementation and enforcement of the Notice as of February 1, 2009 violates the Commerce Clause of the United States Constitution, although this challenge was abandoned as to the Department's requirement for each licensee to have a principal place of business or other physical location in Pennsylvania, which the Department rescinded by Interpretative Letter of December 18, 2008.

At a hearing on Cash America's request for a preliminary injunction, the parties agreed to file cross motions for summary judgment, and the Department agreed not to enforce the change of policy pending a decision by this Court. The Department first filed an Answer, and its filing included a Counterclaim for Declaratory Judgment alleging that Cash America is a Delaware limited liability company that is licensed by the Nevada Division of Financial Institutions with no offices, employees or agents physically present in Pennsylvania. In Paragraphs 9–12 the Department averred that Cash America

makes loans to Pennsylvania residents over the Internet in amounts of the lesser of 25% of the borrower's gross monthly income or $750, which are due on the first payday between 8 and 35 days from the date of the loan or, if none, in 14 days. Cash America assesses a finance charge of 25% of the amount borrowed. The annual percentage rate (APR) would be as follows: term 8 days, APR 1140.63%; term 14 days, APR 651.79%; term 35 days, APR 260.71%. Cash America admitted the averments of Paragraphs 9–12 in its Answer. Cash America also admitted earning approximately $20 million from Internet loans to Pennsylvania residents in fiscal years 2007–2008.

The Department asserted that Cash America was violating the CDCA by making covered loans without a license and that because it was not licensed it was prohibited from charging interest, fees, charges or other consideration that aggregate in excess of the annual percentage rate of 6% under Section 201 of the Act commonly known as the Loan Interest and Protection Law (LIPL), Act of January 30, 1974, P.L. 13, *as amended,* 41 P.S. § 201. The Department requested a declaration that Cash America's Internet lending to Pennsylvania residents is not authorized by Pennsylvania law and violates the CDCA and the LIPL.

## II

 The Court turns first to the procedural issue that Cash America raises, *i.e.,* that the Notice constitutes an invalid regulation because it was not adopted pursuant to the requirements of the Act commonly known as the Commonwealth Documents Law (Documents Law), Act of July 31, 1968, P.L. 769, *as amended,* 45 P.S. §§ 1102–1602.[1] Section 102(12) of the Doc-

---

1. Cash America has failed to provide a state- ment of questions involved as required by Pa.

uments Law, 45 P.S. § 1102(12), defines the word "regulation" as "any rule or regulation, or order in the nature of a rule or regulation, promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency, or prescribing the practice or procedure before such agency."[2]

 In *Pennsylvania Human Relations Commission v. Norristown Area School District*, 473 Pa. 334, 350, 374 A.2d 671, 679 (1977), the Supreme Court held that agency action constitutes a regulation, as opposed to a general statement of policy, when it purports to establish a "binding norm." In *Norristown* the court explained that a general statement of policy is neither a rule nor a precedent but is merely an announcement to the public of the policy that an agency intends to implement in future rulemakings or adjudications. A properly adopted substantive rule establishes a standard of conduct that has the force of law, and the underlying policy generally is not subject to challenge before the agency. *Id.* A statement of policy does not establish a binding norm. *Id.* To determine whether an agency has attempted to establish a binding norm without required procedure, courts consider the plain language of the enactment, the manner in which the agency implemented the provision and whether its discretion is restricted by the provision. *R.M. v. Pennsylvania Housing Finance Agency of Commonwealth*, 740 A.2d 302 (Pa.Cmwlth.

1999). Citing *Eastwood Nursing & Rehabilitation Center v. Department of Public Welfare*, 910 A.2d 134 (Pa.Cmwlth.2006), Cash America submits that the Notice is a regulation: it provides that out-of-state lenders must be licensed, is not phrased in terms of future rulemakings and leaves no leeway as to licensure.

 The Department counters that it issued the Notice under its authority pursuant to Section 202.D of the Department of Banking Code, Act of May 15, 1933, P.L. 565, *as amended*, 71 P.S. § 733–202.D, to "issue statements of policy and interpretive letters necessary and appropriate to administer this act or any other statute within the department's jurisdiction to administer or enforce." The Notice merely interprets the CDCA and revises the Department's interpretation in prior interpretive letters. As Cash America admits, the Department's previous letters did not bind the courts or have the force of law. An interpretation established through interpretive letter may be changed by a new interpretive letter. The Department announced the change in the Pennsylvania Bulletin to assure the widest possible public notice. In terms of *R.M.*, the plain language states that the Department is announcing a new interpretation that will be applied in the future; the manner is consistent with its authority under the Department of Banking Code to interpret the CDCA; and the Notice preserves discretion by stating that violators *may* be sub-

R.A.P. 2116. Nevertheless, the Court is able to perceive the issues that it wishes to raise from the arguments made, and the Court chooses not to deem the arguments to be waived on the basis of this defect. Its initial brief also contains a statement of the facts that is improperly lengthy and that improperly includes extensive argument. *See* Pa. R.A.P. 2117.

2. Formal requirements for adoption of a regulation include, in part, publication of notice of intent to promulgate or amend with the text of the proposed regulation, statement of authority, brief explanation of the regulation and request for comments under Section 201, 45 P.S. § 1201, approval as to legality by the Department of Justice pursuant to Section 205, 45 P.S. § 1205, and deposit with the Legislative Reference Bureau under Section 207, 45 P.S. § 1207.

ject to enforcement. *See Chimenti v. Pennsylvania Department of Corrections*, 720 A.2d 205 (Pa.Cmwlth.1998) (holding that document interpreting wiretapping act but reserving agency's discretion in applying the policy was a statement of policy), *aff'd*, 559 Pa. 379, 740 A.2d 1139 (1999).

The Court accepts the Department's position on this issue. Although Cash America insists that the Department's prior interpretations were correct, it concedes that they were contained in interpretive letters. The Department states that no principle of administrative law prevents an agency from reconsidering its interpretation of a statute that it enforces. The Department does not claim that its new interpretation is binding on the courts or even the Department. The manner of adopting the change was consistent with the Department's authority to enforce the CDCA through interpretive letters, and it reserved some discretion. The Notice therefore represents a statement of policy. *See Insurance Fed'n of Pennsylvania, Inc. v. Insurance Department*, 929 A.2d 1243 (Pa. Cmwlth.2007) (holding that agency notice was statement of policy that interpreted existing law), *judgment aff'd*, — Pa. —, 970 A.2d 1108 (2009).

## III

■ Cash America argues on its substantive challenge that Section 3.A clearly and unambiguously excludes from the CDCA's purview an out-of-state lender with no principal, employee, agent, broker or office in Pennsylvania. Cash America submits that the phrase "either as princi-

pal, employe, agent or broker" is a modifier to the immediately preceding phrase "in this Commonwealth." Thus if a lender does not have a "principal, employe, agent or broker" in Pennsylvania, then the lender is not "in this Commonwealth." Cash America contends that this is the only interpretation that gives meaning to all of the act's words. *See Lee Publ'ns, Inc. v. Dickinson School of Law*, 848 A.2d 178 (Pa.Cmwlth.2004) (stating that if possible courts must construe a law to give effect to all provisions so that all words have meaning and none are treated as surplusage); 1 Pa.C.S. § 1921(a).[3] It points out that for more than 70 years no one suggested that the CDCA applied to out-of-state lenders, and it bristles at the assertion that the only natural reading of Section 3.A is the opposite of what the Department has said for years.

In addition, Cash America notes that when the CDCA was enacted in 1937 the Commerce Clause of the United States Constitution was interpreted by the United States Supreme Court to prohibit states from imposing licensure or other requirements on out-of-state businesses. It quotes *Crutcher v. Kentucky*, 141 U.S. 47, 58, 11 S.Ct. 851, 35 L.Ed. 649 (1891), which invalidated a statute requiring in-state agents of out-of-state companies to obtain a license before doing business in Kentucky, even though the agent was located in Kentucky and did substantial intrastate business, and stated that "a state law is unconstitutional and void which requires a party to take out a license for carrying on interstate commerce . . . ." While the Com-

---

**3.** It asserts other CDCA sections as support. Section 7, 7 P.S. § 6207, provided in 1937 and still provides: "A license under the provisions of this act shall be issued only to a corporation organized under the Business Corporation Law of the Commonwealth of Pennsylvania." Section 12 as enacted in

1937 authorized the Secretary to reject an application "if he is not satisfied that allowing such applicant to engage in business will promote the convenience and advantage of the community in which the business of the applicant is to be conducted . . . ." 7 P.S. § 6212 (note).

merce Clause is no longer interpreted so strictly, the Pennsylvania Supreme Court declined to embrace a dynamic view of the constitutionality of a statute that would measure legislative intent in light of constitutional authority that did not exist when the legislature acted. *Commonwealth v. Bavusa*, 574 Pa. 620, 832 A.2d 1042 (2003).[4]

The Department's initial brief first asserts that Pennsylvania has authority to apply its laws to Cash America, quoting *Aldens, Inc. v. Packel*, 524 F.2d 38, 43 (3d Cir.1975) (holding that "Pennsylvania's interest in the rates which its residents pay for the use of money for purchase of goods delivered into Pennsylvania" justified application of the Goods and Services Installment Sales Act to an Illinois company with no physical presence in the Commonwealth). Moreover, it contends, Cash America is violating the LIPL by charging exorbitant interest greatly in excess of 6% annual interest, which is the maximum permitted for loans under $50,000 in general by Section 201(a), 41 P.S. § 201(a). This has been a feature of Pennsylvania law for more than 150 years.

■ The Department's purpose is to protect Pennsylvania citizens "from being exploited at the hands of unscrupulous individuals seeking to circumvent the law at the expense of *unsuspecting* borrowers who may have no other avenue to secure financial backing...." *Smith v. Mitchell*, 420 Pa.Super. 137, 616 A.2d 17, 20 (1992). Section 101 of the LIPL, 41 P.S. § 101, defines "person" broadly to mean "an individual, corporation, business trust, estate trust, partnership or association or any

other legal entity...." Enumerated exceptions to the maximum rate do not include loans by out-of-state lenders. The finance charge is interest because it is "the amount owed to a lender in return for the use of borrowed money." Black's Law Dictionary 829 (8th ed.2004).

The Department argues in its initial brief Section III that Cash America is violating the CDCA by lending to Pennsylvania residents without a license. Section 3.B, 7 P.S. § 6203.B, states that a person "shall be deemed to be engaged in the business contemplated by this act" where that person either "hold[s] himself out as willing or able to arrange for or negotiate" loans of $25,000 or less with interest and charges greater than 6% or "solicits prospective borrowers of such loans...." Section 11, 7 P.S. § 6211, provides that "[a] person, who is not licensed under this act, shall be presumed to be engaged in business contemplated by this act if he advertises or solicits business as principal, agent or broker for which a license is required by the provisions of this act...." Through its website Cash America holds itself out as willing to make nonmortgage loans of less than $25,000 with an interest rate higher than 6% to Pennsylvania residents; it has a page on its website directed to Pennsylvania residents. Bleicken Verification, Ex. E, Department's Brief Appendix (A) A–324.

The Department asserts that the requirement that the lender engage in business "in this Commonwealth" is analogous to language in the statute known as Penn-

---

4. Cash America also points out that other statutes clearly apply to transactions between Pennsylvania residents and out-of-state companies. For example, Section 103 of the Goods and Services Installment Sales Act, Act of October 28, 1966, Special Sess. No. 1, P.L. 55, *as amended*, 69 P.S. § 1103, provides that for the purposes of that act a retail install-

ment contract etc. is made in Pennsylvania and subject to the act "if either the seller offers or agrees in Pennsylvania to sell to a resident buyer of Pennsylvania or if such resident Pennsylvania buyer accepts or makes the offer in Pennsylvania to buy, regardless of the situs of the contract as specified therein."

sylvania's Long Arm Statute, allowing courts to exercise general jurisdiction over a corporation for the "carrying on of a continuous and systematic part of its general business within this Commonwealth[,]" 42 Pa.C.S. § 5301(a)(2)(iii), and the Uniform Interstate and International Procedure Act, permitting personal jurisdiction over a person "[t]ransacting any business in this Commonwealth." 42 Pa. C.S. § 5322(a)(1). The leading case on jurisdiction based on Internet activity was decided under the Long Arm Statute. In *Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119, 1124 (W.D.Pa.1997), the court described a "sliding scale" to determine when a defendant's Internet business subjects it to jurisdiction. At one end: "If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper." *Id.* However, "[a] passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction." *Id.* Cash America has a website page targeted at Pennsylvania borrowers, knows that it is lending to Pennsylvania residents and transmits money into Pennsylvania.

Although the Department did not specifically address in its initial brief the language in Section 3.A of the CDCA deemed by Cash America to be crucial, the Department focuses on this in its reply brief Section I, B. It notes that words and phrases are to be construed according to the rules of grammar and to their common and approved usage. 1 Pa.C.S. § 1903. The Department argues that the structure of Section 3.A makes it unlawful for any unlicensed person to engage in the business of negotiating or making specified types of loans, and it defines the persons whose conduct may fit this activity to include a "principal, employe, agent or broker[.]" The Department asserts that the statute is expanded beyond simply a principal. The fact that the phrase "either as principal, employe, agent or broker" is set off by commas indicates that it is nonrestrictive in nature, *i.e.,* it contains non-essential information and can be removed without changing the sentence's basic meaning. The Department cites W. Strunk, Jr. & E.B. White, *The Elements of Style* 2–5 (4th ed.2000), among other authorities. *But see* 1 Pa.C.S. § 1923(b) (giving effect to punctuation in statutes only after December 31, 1964).

The Department also argues that the remedial purpose of the CDCA, its legislative history and Department experience support application of the CDCA to Cash America. Its central purpose is to protect borrowers "against extortionate interest charges" for "loans of comparatively small amounts, since the business of making such loans profoundly affects the social life of the community." *Equitable Credit & Discount Co. v. Geier,* 342 Pa. 445, 453, 455, 21 A.2d 53, 57, 58 (1941). Remedial statutes "are to be liberally construed to effect their objects." *O'Rourke v. Department of Corrections,* 566 Pa. 161, 177, 778 A.2d 1194, 1203 (2001).[5]

---

**5.** Intent to reach out-of-state lenders assertedly is shown in several ways. The 1937 report to the House of Representatives by the Secretary of Banking that became the basis for the CDCA requested authority to regulate advertising in newspapers and radio. The Department emphasizes the fact that in 1978 the legislature passed, but Governor Shapp vetoed, House Bill No. 2506, which contained an amendment to Section 3.A of the CDCA to *exempt* an out-of-state lender not maintaining an office or place of business in the Commonwealth and not represented by any employee or agent from the requirements of being a corporation organized under the BCL and from the licensing requirement if the lender

If the Court sees any ambiguity in Section 3.A of the CDCA, the Department suggests that its specialized experience with Internet lending supports its interpretation. The Department's change in its policy reflected in the Notice is based on its experience in dealing with the rise of Internet lending and its special knowledge of how such loans can affect the social life of the community. Cash America maintains that the Department's abrupt change in longstanding policy is not due any deference. It relies on *RAG Cumberland Resources LP v. Department of Environmental Protection*, 869 A.2d 1065 (Pa.Cmwlth. 2005), where the department changed its interpretation of the statutory term "shift" for mine inspection purposes; the Court stated that any deference due to the department in that case must yield to evidence that the new interpretation was an abrupt *volte face* from the interpretation that it had followed for more than thirty years.

## IV

The parties offer essentially opposite interpretations of Section 3.A of the CDCA. Although the Department formerly endorsed a contrary interpretation of that section, the Court is convinced that the Department's current interpretation is the correct one. First, Cash America's interpretation of the language of Section 3.A is based almost entirely on its insistence that

the phrase "either as principal, employe, agent or broker" modifies only the preceding phrase "in this Commonwealth[.]" The Court agrees that in the full context, however, "no person shall engage or continue to engage in this Commonwealth, either as principal, employe, agent or broker, in the business of negotiating or making loans [of a specified nature]," the phrase modifies and defines "person" who engages in the business of making specified loans rather than modifying and limiting the meaning of "in this Commonwealth." The Department's point is well taken that this language expands coverage of the act to encompass employees, agents and brokers in the same manner that the CDCA applies to charges and fees beyond interest.

Cash America contends that arguments based upon the Pennsylvania Long Arm Statute are irrelevant because this case does not present the question of whether the exercise of jurisdiction over a nonresident by Pennsylvania courts was constitutionally permissible. In its reply brief, Cash America does not dispute that the Commonwealth would have authority to apply its law to Cash America if the legislature intended to do so. The issue is whether it in fact intended to do so.

Cash America argues that the legislature could not have intended to reach out-of-state lenders with no physical presence

was licensed by the regulatory law of another state similar in principle to the CDCA. *See* A-354–A-355. The legislature must have regarded the existing text of Section 3.A as reaching out-of-state lenders with no physical presence in Pennsylvania.

The dissenting opinion quotes from the Supreme Court's recent opinion in *Malt Beverages Distributors Ass'n v. Pennsylvania Liquor Control Board*, —— Pa. ——, 974 A.2d 1144 (2009), to the effect that the legislature, rather than the courts, should sanction a "momentous transformation" of policy. The context

of that statement was the recognition that the legislature carefully crafted a three-part system for beer distribution consisting of manufacturers; distributors/importing distributors; and retail dispenser licenses. The PLCB's new interpretation of "retail dispenser" would substantially alter that longstanding statutory scheme by giving many retail dispensers the same capability as distributors. Here, the Department made a change to its administrative interpretation of a single provision in the CDCA, which change is consistent with the view of the legislature in 1978.

in 1937 based on prevailing Commerce Clause jurisprudence. The Department responds that Cash America is asking the Court to speculate more than 70 years after the fact as to a particularly sensitive area of constitutional law. The legislature in 1937 clearly saw usurious consumer lending as a threat from which Pennsylvania residents needed protection. The Department maintains that the CDCA, as drafted in general terms, applies to situations not existing in 1937. *See Philadelphia Retail Liquor Dealers Ass'n v. Pennsylvania Liquor Control Board*, 360 Pa. 269, 274, 62 A.2d 53, 55 (1948) ("[S]tatutes framed in general terms apply to new cases that arise, and to new subjects that are created, from time to time, and which come within their general scope and policy.") (quoting *Commonwealth v. Quaker City Cab Co.*, 287 Pa. 161, 166, 134 A. 404, 406 (1926), *rev'd on other grounds*, 277 U.S. 389, 48 S.Ct. 553, 72 L.Ed. 927 (1928)).

Cash America decries the Department's citation to *NCAS* on the basis that the lender involved there had many in-state offices. The opinion in that case, however, expresses forcefully the Supreme Court's view of payday lending as essentially a predatory lending practice and also observes throughout the text of the opinion the methods used by usurious lenders, often involving subterfuge, to attempt to circumvent fundamental public policy. The Supreme Court noted the well-established principle articulated over 100 years ago in *Earnest v. Hoskins*, 100 Pa. 551 (1882), that the Commonwealth's public policy prohibits usurious lending, and it cited a decision entered almost 70 years ago in

*Geier*, holding that it is well settled in constitutional law that the regulation of interest rates is a subject within the police power of the state particularly when it comes to cases involving small loans, which profoundly affect the social life of the community.[6]

Pursuant to Pa. R.A.P. 1532(b), summary relief may be granted when a party's right to judgment is clear and no material issues of fact are in dispute. *Jubelirer v. Rendell*, 598 Pa. 16, 953 A.2d 514 (2008). Based upon its review of the issues and relevant statutory and case law authority, the Court concludes that the Department's right to judgment is clear and no material facts are in dispute. The Department therefore is entitled to summary relief. Because Cash America failed to establish that it is entitled to summary relief, its application for such relief is denied. Accordingly, the Court hereby declares that Cash America's practice of making payday loans to Pennsylvania residents is not authorized by the laws of this Commonwealth and that such lending specifically violates the CDCA and LIPL.

### ORDER

AND NOW, this 10th day of July, 2009, the Court denies the application for summary relief filed by Cash America Net of Nevada, LLC. The Court grants the application for summary relief filed by the Department of Banking and the Secretary of Banking, and it declares that Cash America's operations are in violation of the Consumer Discount Company Act and the Act known as the Loan Interest and Protection Law.

---

**6.** Briefs were submitted in this case by amici on both sides. The brief by Community Legal Services, Inc. and The Pennsylvania AFL–CIO is similar to one cited with approval in *NCAS* providing extensive information on the history of payday lending and the historic methods

that consumer lenders have used to avoid usury laws. A brief on behalf of Cash America argues that payday lending is the most efficient and socially beneficial form of credit for a particular market.

## DISSENTING OPINION BY Judge LEAVITT.

Respectfully, I dissent. Simply, the initiative of the Department of Banking (Department) to abolish the business of payday loans in Pennsylvania has not been authorized by statute.

The Consumer Discount Company Act[1] (CDCA) does not authorize the Department's initiative. Section 3.A provides, in relevant part, as follows:

On and after the effective date of this act, *no person shall engage* or continue to engage *in this Commonwealth, either as principal, employe, agent or broker, in the business of negotiating or making loans* or advances of money or credit, in the amount or value of twenty-five thousand dollars ($25,000) or less, *and charge,* collect, contract for or receive interest, discount, bonus, fees, fines, commissions, charges, or other considerations which aggregate in excess of the interest that the lender would otherwise be permitted by law to charge if not licensed under this act on the amount actually loaned or advanced, or on the unpaid principal balances when the contract is payable by stated installments[,] *except a domestic business corporation organized under or existing by virtue of the Business Corporation Law of this Commonwealth, after first obtaining a license from the Secretary of Banking of the Commonwealth of Pennsylvania in accordance with the provisions of this act.*

7 P.S. § 6203.A (emphasis added). From its enactment in 1937 until last year, the Department understood Section 3.A to require a lender to have a physical presence in Pennsylvania, in the form of a principal, employee, agent or broker, in order for the Department to be authorized to license that lender. Stated otherwise, the Department believed that the CDCA authorized the licensing of those engaged in intrastate, not interstate, lending. Indeed, the Department reiterated this position as recently as 2007 in litigation before this Court.[2]

Cash America, a Delaware-based company licensed by Nevada, does not have a physical presence in Pennsylvania; it makes payday loans available on its website and without geographical boundaries. A borrower, whether in Pennsylvania or in some other state, must surf the Internet to find Cash America and enter into a loan transaction with it. Once on the Cash America website, the borrower must open an account and fill out an application in order to enter into a loan transaction. By clicking on a box entitled "Rates and Terms," the borrower identifies his or her

1. Act of April 8, 1937, P.L. 262, *as amended,* 7 P.S. §§ 6201–6219.

2. The Department took this position in *Pennsylvania Department of Banking v. NCAS of Delaware, LLC, d/b/a Advance America Cash Advance Centers,* 931 A.2d 771 (Pa.Cmwlth. 2007), *affirmed,* 596 Pa. 638, 948 A.2d 752 (2008). The Department's brief, filed in that case, stated as follows:

In [several interpretive] letters, the Department stated that out-of-state lenders who make loans to Pennsylvania residents, but have no physical presence in the Commonwealth, need not be licensed under the CDCA. However, these letters were not a novel administrative interpretation suggestive of any change in underlying public policy against usury. Rather, the Department's view that the CDCA does not apply to out-of-state lenders is based on the plain language of Section 3.A of the CDCA, which states that lenders must be licensed under the statute only when they are "in this Commonwealth" and that the Secretary of Banking may only grant licenses to "domestic business corporations" or, by application of 15 Pa.C.S. §§ 4161–62, to domesticated foreign corporations.

Appendix to Respondent's Motion for Summary Relief at A–171–A–172.

state of residence to learn what requirements, if any, apply to the applicant.

In their *amici curiae* brief, Community Legal Services and the Pennsylvania AFL–CIO point out that Pennsylvanians, and other consumers who apply for a payday loan from Cash America, do so at their peril. First, payday loans are costly, compared to traditional loans.[3] Second, *amici* point out that payday lending can set a trap for the financially vulnerable and unwary who may find themselves in a no-exit cycle of debt. Specifically, by using a paycheck to repay a loan, the payday borrower is left with too little remaining in the paycheck to meet ongoing obligations. The borrower then enters into another payday loan. Soon, instead of living paycheck to paycheck, these borrowers find themselves living payday loan to payday loan.

In July 2008, the Department issued a "Notice to those Engaging or Considering Engaging in Nonmortgage Consumer Lending to Pennsylvania Residents" (Notice), 38 PA. BULL. 3986 (2008). The Notice stated that

> nonmortgage consumer lending to Pennsylvania residents by any means, including by means of the internet or by mail, constitutes engaging in such business "in this Commonwealth" as contemplated by

Section 3.A of the Consumer Discount Company Act (CDCA) (7 P.S. § 6203.A).

*Id.* The Notice explained that the Department had retreated from

> [its] prior position, [that] such an entity would not be required to obtain a license under the CDCA to originate nonmortgage consumer loans by means of the Internet or mail to residents of this Commonwealth in which the charges exceeded 6% simple interest per annum, provided that the entity was licensed or otherwise authorized under the entity's home state law to engage in this type of lending activity.

*Id.* The Department's Notice did not refer specifically to "payday loans," but it did avert to the need to protect Pennsylvania residents from "certain Internet lending practices." Given these "practices," the Notice concluded that

> *the Department is convinced that a change in policy is warranted,* and licensing under the CDCA should be required for all nondepository entities . . . lending to Pennsylvania residents in which the charges exceed 6% simple interest per annum.[4]

*Id.* (emphasis added). A change in policy may well be warranted, and *amici* make a compelling argument that payday lending should be regulated. However, this "change in policy" requires legislation.

---

**3.** Cash America makes loans in small amounts, *i.e.,* the lesser of 25 percent of the borrower's gross monthly income or $750, and for a short duration. Its fees do not exceed 25 percent of the loan amount, which is costly. The Department challenges these fees as constituting an interest rate of 1140.63 percent for an 8–day loan, 651.79 percent for a 14–day loan and 260.71 percent for a 35–day loan. These are *annual* percentage rates. Further, these proffered rates do not consider the fact that to process any loan, regardless of its size, a lender incurs certain irreducible costs.

Cash America asserts that it cannot make loans to Pennsylvania residents under the limits of the CDCA, should the Department's new policy become effective. Cash America Brief at 16. Accordingly, the Department's "new policy," as affirmed by the majority, puts Cash America out of business in Pennsylvania.

**4.** Section 201 of the Loan Interest and Protection Law, 41 P.S. § 201, provides that 6 percent interest is the maximum interest rate that can be charged on non-mortgage loans of $50,000 or less that are made by an *unlicensed* lender.

The Department's attempt to use the CDCA to effect a new regime of regulation does not work. There are several impediments to its attempt.

First, in 1937, when the CDCA was enacted, the jurisprudence of the United States Supreme Court prevented the States from regulating interstate loans under the then-current theory that such action by the States would violate the Commerce Clause in the United States Constitution. U.S. Const. art. 1, § 8, cl. 3.[5] In *Crutcher v. Commonwealth*, 141 U.S. 47, 11 S.Ct. 851, 35 L.Ed. 649 (1891), the Supreme Court held that a Kentucky statute requiring in-state agents of an out-of-state business to acquire a license before doing business in Kentucky was an unconstitutional attempt to regulate interstate commerce. *See also International Text–Book Company v. Pigg*, 217 U.S. 91, 30 S.Ct. 481, 54 L.Ed. 678 (1910) (holding that a Kansas statute requiring out-of-state businesses to file an information statement in Kansas was an impermissible attempt to regulate interstate commerce). In *International Text–Book*, the U.S. Supreme Court explained that "[i]t is the established doctrine of this court that a state may not, in any form or under any guise, directly burden the prosecution of interstate business." *Id.* at 112, 30 S.Ct. 481. Given this jurisprudence, the legislature limited the scope of the CDCA to intrastate loans, lest the CDCA be challenged as an unconstitutional burden on interstate commerce.

Second, the Department's 2008 interpretation of the CDCA gives no effect to the words "principal, employe, agent or broker" that appear in Section 3.A. It is axiomatic that "[t]he Legislature cannot be deemed to intend that its language be superfluous and without import." *Robinson v. Abington Education Association*, 492 Pa. 218, 234 n. 16, 423 A.2d 1014, 1022 n. 16 (1980) (quotation omitted). By using the language "*in this Commonwealth*, either as principal, employe, agent or broker," the legislature was referring to intrastate transactions. Section 3.A of the CDCA, 7 P.S. § 6203.A (emphasis added). This is why the Department, for over 60 years, has publicly expressed the view that the provisions of the CDCA do not apply to out-of-state lenders.

Third, although the CDCA has been amended numerous times, the language of Section 3.A was never amended to extend the reach of the CDCA to out-of-state lenders. Our Supreme Court has explained that when the legislature amends a statute but does not revise or repeal an agency's interpretation of it, this is evidence that the legislature has acquiesced in the interpretation and that the interpretation is, in fact, the one the legislature intended. *Gilligan v. Pennsylvania Horse Racing Commission*, 492 Pa. 92, 99, 422 A.2d 487, 491 (1980).

Indeed, the legislature could have easily amended the CDCA to apply to interstate transactions. For example, the Goods and Services Installment Sales Act,[6] the Pennsylvania Securities Act of 1972[7] and the Debt Management Services Act[8] all include provisions which specifically make those statutes applicable to transactions

5. It states:

The Congress shall have Power ... [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes.
U.S. Const. art. 1, § 8, cl. 3.

6. Act of October 28, 1966, Special Sess. No. 1, P.L. 55, *as amended*, 69 P.S. §§ 1101–2303.

7. Act of December 5, 1972, P.L. 1280, *as amended*, 70 P.S. §§ 1–101–1–703.

8. Act of October 9, 2008, P.L. 1421, 63 P.S. §§ 2401–2449.

made by out-of-state entities with Pennsylvania residents.[9] Clearly, the legislature knows how to craft a statute to make it applicable to an out-of-state actor. The legislature did not, however, use this knowledge to amend the CDCA.

Fourth, the Department's interpretation gives no meaning to the requirement that the lender be a "domestic business corporation organized under ... the Business Corporation Law of this Commonwealth...." Section 3.A of the CDCA, 7 P.S. § 6203.A. When one parses Section 3.A, it reads

> no person shall engage ... in the business of ... making loans ... and charge ... in excess of the interest that the lender would ... be permitted by law to charge if not licensed ... except a domestic business corporation ... after first obtaining a license....

*Id.* This language cannot be squared with the possibility that the CDCA regulates interstate lending. Section 3.A requires the lender seeking a license to be organized as a Pennsylvania corporation; this is a requirement that could only be imposed on a Pennsylvania lender. Otherwise, compliance would require the out-of-state lender to set up a Pennsylvania subsidiary, which would violate the Dormant Commerce Clause.

The Department contends that the fact that the Internet did not exist in 1937 should not have any bearing on the con-struction of the CDCA. I agree with this premise. The Internet is only one of several means of interstate communication. Others include mail, telephone and telegraph, which did exist in 1937. However, the Department uses the Internet as a smokescreen to obscure the words in Section 3.A that can only be understood to limit the scope of the CDCA to intrastate loan transactions.

For example, acknowledging that the CDCA addresses those who do business "in this Commonwealth" as a "principal, employe, agent or broker," the Department explains that Cash America is doing business in Pennsylvania as a principal. By this logic, Cash America, a Nevada-licensed lender, is present electronically in Pennsylvania. If that is so, then the loan transaction is an *intrastate* transaction, with both the lender and borrower "in this Commonwealth." This circular conclusion underscores the fact that Section 3.A was never intended to apply to interstate loans.

In short, it is irrelevant that Cash America is making loans by means of the Internet. The point is that the CDCA does not, and was never intended to, apply to interstate transactions, whether effected by the mail, by telephone or by the Internet. The Department has not thought through the issues presented by the language of Section 3.A.[10] The legislature needs to amend the CDCA to expand its scope to interstate consumer loan transac-

9. *See* Section 103 of the Goods and Services Installment Sales Act, 69 P.S. § 1103 (Act applies if a Pennsylvania buyer agrees to buy, regardless of the situs of the contract); Section 702 of the Pennsylvania Securities Act, 70 P.S. § 1–702 (Act applies when a sale or offer to sell or purchase or offer to purchase occurs in Pennsylvania); and Section 48 of the Debt Management Services Act, 63 P.S. § 2448 (Act is applicable to any debt management or debt settlement agreement entered into with a Pennsylvania resident).

10. The Department concedes that if a Pennsylvania resident physically travels to Nevada to effect a loan from Cash America, the CDCA does not apply. One wonders why not? Particularly where the borrower thereafter communicates with Cash America by Internet, phone or mail from Pennsylvania. What if the Pennsylvania borrower goes to New Jersey and uses the Internet to close the deal with Cash America? These issues need to be considered and addressed in legislation.

tions that involve Pennsylvania residents, if it so desires that result.

Indeed, our Supreme Court has cautioned against an agency ushering in a new regulatory regime that is directly contrary to a long-standing prior regulatory position, without authorizing legislation. In *Malt Beverages Distributors Association v. Pennsylvania Liquor Control Board*, — Pa. ——, 974 A.2d 1144 (2009), our Supreme Court refused to uphold the issuance of a retailer's license to Sheetz to sell take-out beer. It explained:

> While a policy determination in this regard may well be accomplished by our legislature, it is not our role to sanction such *a momentous transformation. Uniontown Newspapers, Inc. v. Roberts*, 576 Pa. 231, 839 A.2d 185, 194 (2003) (providing that policy considerations do not lie with the courts, but are reserved for the legislative body to resolve.)

*Id.*, at 1154 (emphasis added). Likewise, the "momentous transformation" sought here by the Department of Banking should be accomplished by the legislature and not by the courts.

As a final point, the relief ordered by the majority exceeds the bounds of a declaratory judgment action. The majority "declares that Cash America's practice of making payday loans to Pennsylvania residents is not authorized by the laws of this Commonwealth and that such lending specifically violates the CDCA and [the Loan Interest and Protection Law]." Majority op. at 1038. The Department agreed to delay the effective date of its enforcement initiative date until this Court decided whether the Department's Notice correctly construed the CDCA, so Cash America cannot be in violation of a yet-to-be initiated enforcement action. Further, it is a misdemeanor to violate the licensing requirements of the CDCA. The judgment of the majority, as stated, prejudges the outcome of a criminal case, which, *inter alia*, violates the rules of criminal procedure as well as due process.

The issues surrounding payday loans should be presented to the legislature. The legislature can then decide what is best for Pennsylvania residents and determine whether to outlaw entirely or to regulate payday lending practices. Legislation is the means necessary to usher in the "change in policy" sought by the Department as well as *amici curiae*. For the Department to outlaw payday loans by administrative fiat violates the long-standing principle that an "administrative agency can only exercise those powers which have been conferred upon it by the Legislature in clear and unmistakable language." *Aetna Casualty and Surety Co. v. Insurance Department*, 536 Pa. 105, 118, 638 A.2d 194, 200 (1994) (citation omitted).

I would grant Cash America's Application for Summary Relief.

Judge COHN JUBELIRER and Judge SIMPSON join in this dissent.