**Tia L. KANEFF, Appellant**

v.

**DELAWARE TITLE LOANS, INC.**

No. 08–1007.

United States Court of Appeals, Third Circuit.

Argued Jan. 15, 2009.

Filed Nov. 24, 2009.

Robert F. Salvin (Argued), Community Impact Legal Services, Inc., Chester, PA, for Appellant.

Mark J. Levin (Argued), Ballard, Spahr, Andrews & Ingersoll LLP, Philadelphia, PA, for Appellee.

Before: SLOVITER, BARRY, and SILER,[*] Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

Appellant asks us to confront what has become a vexing issue in our current economy here and elsewhere—the extent to which low income borrowers may have access to legal remedies that they waived in a desperate attempt to borrow needed cash. Because many of the lending contracts contain an arbitration provision, there are often issues relating to the permissible scope of the arbitration and the role of the arbitrator. These are the principal issues in the appeal before us. In deciding this appeal, we must balance the rights and legitimate expectations of the parties, but only in terms of deciding whether the arbitration provision should be enforced.

## I.

### The Operative Facts[1]

The Appellant, Tia Kaneff, is representative of a low income borrower. She separated from her husband in September 2005, and moved into an apartment in Plymouth Meeting, Pennsylvania, with her two children. Plymouth Meeting is approximately 30 miles from the border between Pennsylvania and Delaware. According to the complaint, Kaneff drives a 1994 Buick Park Avenue with 90,000 miles on it that is valued at about $3,000. She works as a Frozen Food Manager at a Giant Supermarket in Plymouth Meeting, Pennsylvania. Her car is her sole means of transportation to her job.

In November 2005, Kaneff realized she would not have enough money to pay rent for December. She tried to get a loan from a bank but was turned down. She then sought a car title loan from appellee Delaware Title Loans, Inc. ("DTL"), which is located in Claymont, Delaware, less than a mile from the border with Pennsylvania.

After driving a short distance to DTL's office, Kaneff sought a loan for $500. To get this amount, Kaneff was first ordered to pay a $5 fee to the Department of Motor Vehicles for recording the lien on her car and a $45 fee to Continental Car Club for an unknown purpose (the contract provides that DTL can retain a portion of these fees, and Kaneff noted in her affidavit that she believed the car club fee was for "the purchase of some sort of insurance"). App. at 50. These fees brought the total amount financed to $550. DTL charged an annual interest rate of 300.01%. The finance charge for the $550 borrowed by Kaneff was $135.62 for the month-long term of the loan, resulting in a total expected payment at the end of the month of $685.62.

---

[*] Hon. Eugene E. Siler, Jr., Senior Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

1. We take the facts from the complaint, the contract attached thereto, and Kaneff's affidavit.

Kaneff claims that she did not understand that her loan was only for a month, and instead believed that she would have six months of $136 monthly payments (for a total payoff amount of $816). In fact, that $136 ($135.62) was merely what she owed in interest for one month. Her single payment of $685.62 was due on December 23, 2005. Believing that her total monthly payment was $136, Kaneff paid as follows:

$136 on December 30, 2005 (this first payment was made after the loan was already scheduled to be paid in full)

$136 on January 20, 2006

$145 on February 25, 2006 (made late)

$125.50 on March 31, 2006 (also made late, and for below the payment amount, possibly because she believed it was offset by the prior month)[2]

$150 on April 23, 2006

$150 on May 22, 2006

In June 2006, the month after Kaneff made the sixth payment, she called DTL to learn what her balance was, and was told she now owed $783. Thus, Kaneff had paid DTL a total of $842.50 within six months of borrowing $550 and was far from finished. Kaneff refused to pay any more, and DTL began calling Kaneff "incessantly, one or more times a day, demanding payment." App. at 53. The company also called Kaneff on her cell phone and at work, despite Kaneff telling them not to do so. Finally, on September 21, 2006, DTL repossessed Kaneff's car. Kaneff received a letter on September 29, 2006, stating that she would need to pay

$1415.60 to get her car back, as otherwise it would be sold sometime after October 8, 2006.

Kaneff filed a putative class action against DTL in Pennsylvania state court, which included a request for a temporary restraining order and a preliminary injunction seeking the return of her car, which she needed to continue working.

The state court granted Kaneff's motion for a preliminary injunction and directed DTL to return Kaneff's car. DTL then removed the action to the United States District Court for the Eastern District of Pennsylvania under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). The District Court granted DTL's motion to compel arbitration, and later dismissed the case with prejudice. Kaneff appeals these decisions.

## II.

### The Contract

The contract Kaneff signed with DTL states, "[t]his agreement shall be construed, applied and governed by the laws of the State of Delaware. The unenforceability or invalidity of any portion of this Agreement shall not render unenforceable or invalid the remaining portions hereof." App. at 38. The contract's arbitration clause requires both parties to arbitrate any disputes, but there is a significant exception to the parties' requirement to arbitrate. DTL, the lender, is not required to enter arbitration before seeking repossession of the vehicle through judicial process or self-help.[3]

---

**2.** Kaneff does not explain the different payment amounts or how DTL reacted to the late payments.

**3.** The text of the Arbitration provision, as relevant here, reads:

Any and all disputes, controversies or claims (collectively, "claims" or "claim"),

whether preexisting, present or future, between the BORROWER and LENDER, or between BORROWER and any of LENDER's officers, directors, employees, agents, affiliates, or shareholders, arising out of or related to this Agreement (including LENDER'S right to seek a money judgment against BORROWER in the event of default,

If the borrower seeks arbitration the borrower must pay the first $125 of the filing fee, after which the lender agrees to pay the remaining arbitration costs. Additionally, "[t]he parties agree to be responsible for their own expenses, including fees for attorneys, experts and witnesses." App. at 38. There are block letters at the bottom of the agreement that reiterate that the borrower has waived all rights to litigate any claim in court and that the borrower also waives the right to participate in any class action or class-wide arbitration unless the claim has already been certified by the date of the agreement.[4]

## III.

### Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1332(d)(2). DTL met the $5 million threshold for jurisdiction under the Class Action Fairness Act by claiming that, under Kaneff's theory of liability, it had received $3,846,481 in interest from Pennsylvania residents over the four years prior to the suit, and faced potential treble damage liability. This court has jurisdiction under 28 U.S.C. § 1291.

■■■■ A district court decides a motion to compel arbitration under the same standard it applies to a motion for summary judgment. *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir.1980). The party opposing arbitration is given "the benefit of all reasonable doubts and inferences that may arise." *Id.* On appeal, a "question concerning the applicability and scope of an arbitration agreement" is subject to de novo review. *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 176 (3d Cir.1999).

## IV.

### Discussion

In the case before us, Kaneff challenges both the arbitration provision and the contract as a whole. Her challenge to the contract is not one of alleged procedural unconscionability, such as whether the type was too small to be legible. Instead, her claim is one of substantive unconscionability, similar to the one raised in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006), where the borrowers claimed that the contract violated state lending and consumer-protection laws and was therefore unenforceable.

In *Buckeye*, the borrowers brought a putative class action against their lender in Florida state court, alleging that the lender charged usurious interest rates. *Id.* at

---

*but excluding LENDER's right to seek possession of the Collateral in the event of default by judicial or other process including self-help repossession.) shall be decided by binding arbitration under the [Federal Arbitration Act].* Any and all claims subject to arbitration hereunder, asserted by any party, will be resolved by an arbitration proceeding which shall be administered by the American Arbitration Association.
App. at 38 (emphasis in original).

4. The relevant provision reads as follows:
BY AGREEING TO ARBITRATE DISPUTES, BORROWER WAIVES ANY RIGHT BORROWER MAY OTHERWISE HAVE HAD TO LITIGATE CLAIMS THROUGH A COURT OR TO HAVE A JURY TRIAL. FURTHER, UNLESS A CLAIM IS ALREADY CERTIFIED BEFORE THE DATE OF THIS AGREEMENT, BORROWER HEREBY AGREES BORROWER MAY NOT PARTICIPATE IN A CLASS ACTION OR A CLASS–WIDE ARBITRATION, EITHER AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OR CLAIMANTS PERTAINING TO SUCH CLAIM AND BORROWER HEREBY EXPRESSLY WAIVES BORROWER'S RIGHT TO JOIN OR REPRESENT SUCH A CLASS.
App. at 38.

443, 126 S.Ct. 1204. The lender moved to compel arbitration based on an arbitration clause in the contracts. *Id.* at 442–43, 126 S.Ct. 1204. The Court noted that there are two types of challenges to an arbitration agreement:

> One type challenges specifically the validity of the agreement to arbitrate. The other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.,* the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid. Respondents' claim is of this second type.

*Id.* at 444, 126 S.Ct. 1204 (citation and footnote omitted). In considering the case before it, the Court stated, that "[t]he crux of the complaint is that the contract as a whole (including its arbitration provision) is rendered invalid by the usurious finance charge." *Id.* The Court explained that plaintiffs' allegations that the lender charged usurious interest rates and that the agreement violated various Florida lending and consumer-protection laws related to the entire contract, rather than specifically to the arbitration provision. *Id.* at 446, 126 S.Ct. 1204. As a result, the Court held that the challenge was one that must go to the arbitrator. *Id.* at 446, 449, 126 S.Ct. 1204.

It reiterated, referring to its prior opinions in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), and *Southland Corp. v. Keating,* 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Buckeye,* 546 U.S. at 447, 126 S.Ct. 1204. It also reiterated, referring to *Howsam v. Dean Witter Reynolds,* 537

U.S. 79, 84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002), "a gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide."

■ In making the determination of arbitrability, we must first consider whether to apply Pennsylvania law or Delaware law. Kaneff argues that the contract is unconscionable under Pennsylvania law, a challenge that requires us to conduct a choice of law analysis inasmuch as Delaware law is specified in the contract.

■■ We exercise plenary review over the question of which state's substantive law governs. *Berg Chilling Sys., Inc. v. Hull Corp.,* 435 F.3d 455, 462 (3d Cir. 2006). It is now black letter law that "in an action based on diversity of citizenship jurisdiction, we must apply the substantive law of the state in which the District Court sat, including its choice of law rules." *Id.* (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Here, that state is Pennsylvania.

Applying Pennsylvania's choice of law rules, we must determine whether there is a true conflict between the application of Delaware law and Pennsylvania law. As discussed below, a true conflict exists here. Because this is a contract case, the law of the state specified in the contract will be applied unless:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188 [of the Restatement (Second) of

Conflicts of Law], would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Berg,* 435 F.3d at 463–64 (quoting Restatement (Second) of Conflicts of Law § 187(2) (1971)). *See also Gay v. CreditInform,* 511 F.3d 369, 389 (3d Cir.2007) ("it seems reasonable to use Pennsylvania law in evaluating the choice-of-law question"). Inasmuch as Delaware is where the contract was signed, we conclude that part (a) above is satisfied because there is a substantial relationship between the state of choice and the transaction. Therefore, our focus is on part (b) above.

Kaneff argues that applying Delaware law rather than Pennsylvania law to the arbitration clause would violate a fundamental policy of Pennsylvania because the arbitration agreement would be considered unconscionable under Pennsylvania law. She focuses primarily on the different treatment accorded the issue of usury in Pennsylvania and in Delaware. The annual interest provided in the DTL contract is over 300%. Delaware has no usury law. In contrast, Pennsylvania has a general usury statute, Act 6, 41 Pa. Cons.Stat. Ann. §§ 101 *et seq.,* prohibiting interest charges of over 6% a year, *id.* § 201, and authorizing those charged higher rates to sue in an action in which they may also collect attorney's fees and costs, *id.* § 503. There can be no question that there is a true conflict between Delaware and Pennsylvania in their approach to and treatment of usurious interest. Although we do not consider the unconscionability of the agreement as a whole, an issue that *Buckeye* teaches is for the arbitrator, we do consider the usury issue as part and parcel of whether the arbitration clause should be enforced. The choice of law analysis cannot be divorced from that issue.

Kaneff contends that the usury statute embodies a fundamental policy of Pennsylvania because:

[T]he statute does not allow for waiver, 41 [Pa. Cons.Stat. Ann.] § 408, violations are punished under Pennsylvania's criminal law, [*i*]*d.* § 505, and plaintiffs are granted an automatic right to collect punitive damages without any showing of outrageous, wanton or malicious conduct. *Id.* §§ 502 & 504. *See Olwine v. Torrens,* 236 Pa.Super. 51, 56, 344 A.2d 665 (1975) ("[t]he statute against usury forms a part of the public policy of the state and cannot be evaded by any circumvention or waived by the debtor") (citation omitted). The usury statute also gives a prevailing plaintiff the right to collect attorney's fees and costs from the defendant. [41 Pa. Cons.Stat. Ann.] § 503. This last point is important in connection with DTL's arbitration clause because one of the restrictive covenants DTL is trying to enforce makes each party responsible for their own fees and costs.

Appellant's Br. at 17–18.

Kaneff argues that "[s]ection 408 of Act 6, 41 [Pa. Cons.Stat. Ann.] § 408, governs choice of law with respect to the interest rate and liability. This is the section of the act that invalidates waivers and states expressly that Act 6 applies, '[n]ot withstanding any other law,' which certainly includes Delaware law." Appellant's Br. at 18. DTL responds that the Pennsylvania statute is inapplicable to a loan originating in Delaware and made by a Delaware corporation. It argues that unconscionability should not be equated with a fundamental policy of the state, citing a 1985 Pennsylvania Superior Court decision for the proposition that unconscionability "was still a novel and undefined concept in Pennsylvania's jurisprudence." Appellee's Br. at 14 (citing

*Germantown Mfg. Co. v. Rawlinson,* 341 Pa.Super. 42, 491 A.2d 138 (1985)). Of course, in the more than two decades since the Superior Court's decision in *Rawlinson,* there have been numerous cases that have focused on unconscionability as a defense which is no longer a novel concept.

The parties marshal the factors often considered in choice-of-law determinations. Kaneff argues that Pennsylvania has the greater interest in the transaction because it is where she lives and, therefore, Pennsylvania has a strong interest in applying its consumer protection laws for the benefit of its residents. Pennsylvania is also the location of the collateral, Kaneff's car, and DTL was required to enter Pennsylvania in order to repossess the car. Finally, Kaneff argues that Pennsylvania's interest is superior to that of Delaware "because Pennsylvania will have to live with the aftermath of the transaction." Appellant's Br. at 20 (emphasis omitted). Kaneff posits that if her automobile were repossessed and she lost her employment as a result, it is Pennsylvania that would be obliged to pay unemployment and medical benefits, while deprived of the taxes generated from her former wages.

DTL, in contrast, argues that Delaware has the greater interest in the transaction because:

> (1) the loan agreement (a) was entered into and signed in Delaware by a Delaware corporation and a Pennsylvania resident who drove 30 miles to Delaware to obtain the loan, (b) requires repayment in Delaware and (c) provides that the agreement shall be "construed, applied and governed" by Delaware law, (2) the lender (a) is incorporated in Delaware, (b) is licensed and regulated in Delaware by the Delaware State Bank Commissioner and (c) has its only offices in Delaware.

Appellee's Br. at 18. DTL also argues that "Pennsylvania's Business Corporations Law provides that a foreign business corporation is not doing business in the Commonwealth by carrying on in the Commonwealth the acts of, *inter alia,* creating or acquiring security interests in personal property or '[s]ecuring or collecting debts or enforcing any rights in property securing them.'" Appellee's Br. at 23 (quoting 15 Pa. Cons.Stat. Ann. § 4122(a)(8)).

A recent decision of the Pennsylvania Commonwealth Court, *Cash America Net of Nevada, LLC v. Pennsylvania Department of Banking,* 978 A.2d 1028, 1030 (2009), could shed some light on this issue. In the course of that court's decision, which dealt with the policy of the Pennsylvania Department of Banking "that engaging in nonmortgage consumer lending to Pennsylvania residents by any means … constitutes engaging in such business 'in this Commonwealth' as contemplated by section 3.A of the Consumer Discount Company Act (CDCA)," *id.* at 1031, the court commented on the Department's "special knowledge of how such loans can affect the social life of the community," *id.* at 1037. It referred to a prior opinion of the Pennsylvania Supreme Court, *Pennsylvania Department of Banking v. NCAS of Delaware, LLC,* 596 Pa. 638, 948 A.2d 752, 754 (2008), as stating:

> [T]he methods used by usurious lenders, often involv[e] subterfuge, to attempt to circumvent fundamental public policy. The Supreme Court noted the well-established principle articulated over 100 years ago in *Earnest v. Hoskins,* 100 Pa. 551 (1882), that the Commonwealth's public policy prohibits usurious lending, and it cited a decision entered almost 70 years ago in *[Equitable Credit & Discount Co. v. Geier,* 342 Pa. 445, 21 A.2d 53 (1941)],* holding that it is well settled in constitutional law that the regulation

of interest rates is a subject within the police power of the state particularly when it comes to cases involving small loans, which profoundly affect the social life of the community.

*Id.* at 1038, 978 A.2d 1028.

Under all of the circumstances set forth above, Pennsylvania has a materially greater interest than Delaware in the determination of whether the arbitration clause is unconscionable. Although the issue is not free from doubt, we conclude that Pennsylvania's interest in the dispute, particularly its antipathy to high interest rates such as the 300.01 percent interest charged in the contract at issue, represents such a fundamental policy that we must apply Pennsylvania law.

In doing so, we note that Pennsylvania law, like federal law, favors the enforcement of arbitration agreements. *Salley v. Option One Mortgage Corp.*, 592 Pa. 323, 925 A.2d 115, 119 n. 2 (2007). Both require that arbitration agreements be enforced as written and allow an arbitration provision to be set aside only for generally recognized contract defenses, such as unconscionability. *Thibodeau v. Comcast Corp.*, 912 A.2d 874, 880 (2006), *appeal denied sub nom. Afroilan v. AT & T Wireless & Panosonic Telecomm. Sys. Co.*, 594 Pa. 708, 937 A.2d 442 (2007). We have little difficulty concluding that Kaneff's agreement to arbitrate would not be considered unconscionable under Pennsylvania law.

Our choice of law determination may not necessarily apply to each challenged provision. The *Buckeye* Court held, "as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Buckeye*, 546 U.S. at 445, 126 S.Ct. 1204. As this court stated in *Berg*, an opinion authored by then-judge (now Jus-

tice) Alito, "[b]ecause choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case." *Berg*, 435 F.3d at 462.

In addition to her challenge to the usurious interest rate, Kaneff argues that the arbitration clause is unconscionable because:

(a). DTL's one-way arbitration clause is unconscionable because it prevents borrowers from defending against repossessions.

(b). The class action waiver in DTL's arbitration agreement is unconscionable because it shields DTL from prospective injunctive relief so that an arbitrator is powerless to order DTL to cease engaging in on-going illegal conduct.

(c). The cost sharing clause in DTL's arbitration clause is unconscionable because it denies a plaintiff statutory attorney's fees, making arbitration too expensive for a plaintiff to pursue.

(c). The mandatory $125 filing fee is unconscionable because it is an additional impediment to bringing a small claim against DTL and does not allow for waiver for a low income litigant.

(e). The provisions are not susceptible to severance because they are included in the arbitration clause as part of a scheme to protect potentially illegal conduct from legal scrutiny.

We, of course, are only deciding the validity of the arbitration clause and consider Kaneff's claims in that context only, just as the arbitrator will consider those claims when s/he decides the validity of the agreement as a whole. Suffice it to say that, with one exception, we find for our purposes that those challenges are wanting. The exception is the provision that

"[t]he parties agree to be responsible for their own expenses, including fees for attorneys, experts and witnesses." App. at 38. That provision is likely unconscionable. *See Parilla v. IAP Worldwide Servs., VI, Inc.,* 368 F.3d 269, 278–79 (3d Cir. 2004); *cf. Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 90, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000) (noting that prohibitively expensive arbitration may render a clause unenforceable). The provision, however, is severable pursuant to the severability clause of the agreement. *See* App. 38. For the reasons set forth above, we will affirm the District Court's order compelling arbitration and reject Kaneff's arguments without further discussion.