**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

‾‾‾‾‾‾‾‾‾‾

No. 13-1879

‾‾‾‾‾‾‾‾‾‾

LINCOLN T. GRISWOLD; LINCOLN T. GRISWOLD
FAMILY LLP

v.

COVENTRY FIRST LLC; THE COVENTRY GROUP,
INC.; MONTGOMERY CAPITAL, INC.; COVENTRY
FINANCIAL LLC; REID S. BUERGER,

Appellants

‾‾‾‾‾‾‾‾‾‾

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 10-cv-05964)
District Judge:  Honorable C. Darnell Jones, II

‾‾‾‾‾‾‾‾‾‾

Argued January 14, 2014
Before: AMBRO, HARDIMAN
and GREENAWAY, JR., *Circuit Judges*.

(Opinion Filed:  August 11, 2014)

Ronald J. Mann [ARGUED]
Gerard M. McCabe
Mitts Law
1822 Spruce Street
Philadelphia, PA 19103

Daniel P. Goetz
R. Eric Kennedy
Weisman, Kennedy & Berris
1600 Midland Building
101 West Prospect Avenue
Cleveland, OH 44115

Mark D. Griffin
Thorman Petrov Griffin
3100 Terminal Tower
50 Public Square
Cleveland, OH 44113

Peter Hardin Levine
J. Matthew Linehan
Daniel P. Petrov
Christopher P. Thorman
Thorman & Hardin-Levine
1220 West Sixth Street
Cleveland, OH 44113
        *Attorneys for Lincoln T. Griswold and Lincoln*
        *Griswold Family LLP, Plaintiffs-Appellees*

Kannon K. Shanmugam [ARGUED]
Stephen D. Andrews
Kenneth J. Brown
Sarah K. Campbell

David Forkner
Marcie R. Ziegler
Williams & Connolly
725 12th Street, N.W.
Washington, DC 20005

F. Warren Jacoby
Jennifer M. McHugh
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
    *Attorneys for Coventry First, LLC, Coventry Group,
    Inc., Montgomery Capital, Inc., Coventry Financial
    LLC, and Reid S. Buerger, Defendants - Appellants*

_____

OPINION

_____

HARDIMAN, *Circuit Judge*.

Appellee Lincoln T. Griswold purchased a life insurance policy that was later sold to Appellant Coventry First LLC (Coventry) for an allegedly inflated price that included undisclosed kickbacks to the broker. Griswold sued, and Coventry moved to dismiss the case for lack of standing or, in the alternative, to compel arbitration. The District Court denied the motion and Coventry appealed. Two questions are presented: (1) whether we have appellate jurisdiction to review the District Court's denial of a motion to dismiss for lack of standing; and (2) whether the District Court erred when it denied a motion to compel arbitration.

3

I

This appeal arises from an alleged fraud in connection with a "life settlement," which involves the sale of a life insurance policy for more than its cash-surrender value but less than the net death benefit. The purchaser of the policy pays the premiums until the original policy owner's death, at which time the purchaser collects the death benefit.

In January 2006, Griswold purchased an $8.4 million life insurance policy. He then established the Lincoln T. Griswold Irrevocable Trust (the Trust) under Georgia law for the "sole and exclusive purpose" of owning the policy and he disclaimed any personal "right, title or interest in or power, privilege or incident of ownership" in the trust property. He appointed Wells Fargo Bank to serve as Trustee.

Two weeks after the Trust was formed, Griswold named Griswold LLP[1] as its sole beneficiary.[2] According to the terms of the partnership agreement, Griswold LLP would

---

[1] The partners in the LLP were Griswold, who owned 99% of the shares, and his son, Kirk Griswold, who owned the remainder.

[2] The partnership also served as the borrower under a financing agreement made with Bedrock Financing, in which the partnership received funds and then transmitted them to the Trust to pay the premiums on the life insurance policy. The partnership agreement specifically prohibited the partnership from "engag[ing] in any business or activity whatsoever except as specifically authorized" in the partnership agreement or the financing agreement with Bedrock. JA 370 (§ 2.7).

4

dissolve once it fulfilled its limited purpose of receiving the proceeds of the life insurance policy. At that point, it would enter into a "winding-up period," during which the trustee was tasked with "liquidating its property, satisfying the claims of its creditors, and distributing any remaining property or the proceeds therefrom to the Partners." JA 382 (§ 9.3). Upon completion of the winding up period, the liquidating trustee would file a "Cancellation of the Election to Become a Limited Liability Partnership" to terminate the partnership. JA 384 (§ 9.8).

In January 2006, the Trust appointed Mid-Atlantic Financial as its exclusive agent to "identify, select and appoint" a life-settlement broker who would help the Trust sell Griswold's life insurance policy. JA 326 (§ 1.1). Mid-Atlantic selected Kevin McGarrey, who had previously assisted Griswold in procuring the policy, to be the settlement broker. In March 2008, McGarrey reached out to Appellant Coventry First LLC (Coventry), a Pennsylvania-based insurer and significant player in the life settlement industry, indicating that Griswold's life insurance policy was for sale and that Mid-Atlantic had authorized him to broker a life settlement for a commission of $84,000. In his complaint, Griswold alleges that Coventry rigged the bidding process by having McGarrey sign a written producer agreement—the "Secret McGarrey Agreement"—promising to refrain from seeking any further bids and to report any competing offers and their material terms to Coventry. In exchange, Coventry allegedly allowed McGarrey to "self-determine" his commission to the tune of $145,000, which was $61,000 more than what he was entitled to. Accordingly, McGarrey did not put the policy on the competitive market and did not pursue any other potential buyers.

Coventry offered $1.675 million for the Griswold policy—$1.53 million for the policy and $145,000 for McGarrey's commission. Coventry and McGarrey did not disclose the amount of broker compensation to the Trust or to Griswold.[3] On March 31, 2008, the Trust sold its policy to Coventry without having received a competing offer. The written purchase agreement contained the following arbitration clause:

> All disputes and controversies of every kind and nature between the Parties arising out of or in connection with this Agreement including, but not limited to, its existence, construction, validity, interpretation or meaning, performance, non-performance, enforcement, operation, breach, continuance, or termination thereof shall be submitted and settled by arbitration in accordance with the rules of the American Arbitration Association.

JA 648 (§ 8.8). Once Coventry acquired the life insurance policy, the Trust dissolved, having fulfilled its sole purpose. The Trustee, Wells Fargo, then transferred the proceeds of the sale to Griswold LLP, the sole beneficiary. In December 2008, the partners of Griswold LLP filed a "Cancellation of

---

[3] At the time, neither Pennsylvania nor Georgia state law required the policy purchaser to disclose the broker compensation to the policy owner. However, Pennsylvania law imposed a fiduciary duty on the broker to disclose the amount of compensation, 40 Pa. Stat. Ann. § 626.7(d). Thus Griswold argues that Coventry is liable for aiding and abetting McGarrey's deliberate breach of fiduciary duty. 40 Pa. Stat. Ann. § 626.2.

6

Limited Liability Partnership Election" in Georgia state court pursuant to the LLP's partnership agreement.

In September 2010, after learning of Coventry's alleged fraud, Griswold sued Coventry, Coventry Group, Montgomery Capital, Coventry Financial, and Reid S. Buerger, Coventry's Executive Vice President, in Pennsylvania state court on behalf of himself—both in his individual capacity and as the former majority partner of Griswold LLP—and on behalf of a class of persons who had sold their life insurance policies to these Defendants. Griswold alleged that Coventry's collusion with McGarrey to conceal his self-determined commission and rig the bidding process constituted common law fraud, fraudulent concealment, conversion, aiding and abetting the breach of fiduciary duties, unjust enrichment, and also violated state life settlement acts, the Sherman Act, and the Racketeer Influenced and Corrupt Organizations Act (RICO).

Because the class action sought over $5 million in damages, Coventry removed the case to the United States District Court for the Eastern District of Pennsylvania. In recognition of the fact that Griswold had not signed the purchase agreement, Coventry filed a motion to dismiss for lack of standing, or in the alternative, to compel arbitration pursuant to the purchase agreement.[4] In response, Griswold filed an "Election to Revive and Reinstate and Otherwise

---

[4] Only the Griswold Trust, which has since dissolved, signed the purchase agreement; neither of the Appellees—Griswold and Griswold LLP—were signatories. Thus, Coventry is the only party to this litigation to have signed the purchase agreement.

Become a Limited Liability Partnership," followed by an Amended Complaint adding Griswold LLP as a Plaintiff. JA 480. Coventry moved to dismiss the Amended Complaint.

The District Court denied Coventry's motion to dismiss, finding that because "Griswold possesses a proprietary interest in the property of Griswold LLP that was injured, both Lincoln T. Griswold and the LLP have Article III standing." JA 4. The District Court then denied Coventry's alternative motion to compel arbitration, holding that the arbitration clause was "unenforceable as to Plaintiffs who are non-signatories." *Id.* Coventry timely appealed.

II

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332(d). We have appellate jurisdiction over the District Court's denial of defendants' motion to compel arbitration pursuant to 28 U.S.C. § 1291 and the Federal Arbitration Act (FAA), 9 U.S.C. § 16(a)(1)(B), which provides that "[a]n appeal may be taken" from an order denying a petition to compel arbitration. *See E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber and Resin Intermediates S.A.S.*, 269 F.3d 187, 204 (3d Cir. 2001).

The parties dispute whether we have appellate jurisdiction to review the District Court's denial of Coventry's motion to dismiss for lack of standing. Coventry argues that we have not only the authority but the obligation to determine whether Appellees possess standing because it is a "threshold jurisdictional requirement" both in the district court and on appeal. Coventry Br. at 18-19 (citing *Majestic Star Casino*, *LLC v. Barden Development, Inc.*, 716 F.3d 736, 747-49 (3d Cir. 2013) ("As a threshold matter of

8

justiciability, we must decide whether the Debtors have standing . . . ."); *Interfaith Community Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 254 (3d Cir. 2005).); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) ("[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review.'") (internal citation omitted).

Though Coventry insists that our decision in *Majestic Star* should guide our analysis, that case bears little similarity to this appeal. There, the standing issue was raised for the first time on appeal and was inextricably intertwined with the merits of the case. *Majestic Star*, 716 F.3d at 749 ("We thus find ourselves in a circumstance where what is ordinarily the preliminary question of standing cannot be answered without delving into whether the entity tax status of [the debtor subsidiary] is 'property' and, if so, whether it belongs to [the subsidiary or the corporate parent]."). Thus, we had no choice but to decide the standing question in *Majestic Star*.

Here, however, we must decide whether we are required to adjudicate the standing issue after it has already been decided by the District Court. As we stated in *Petroleos Mexicanos Refinacion v. M/T King A (Ex-Tbilisi)*, 377 F.3d 329 (3d Cir. 2004), "[t]here are countless cases where a district court rejects a defendant's challenge to the plaintiff's standing; in that posture, defendants simply may not seek immediate review in the court of appeals." *Id.* at 335. In other words, although standing is always a threshold issue, standing to appeal should not be confused with standing to sue. Once a district court has determined that a plaintiff has standing to sue, our power to adjudicate that issue on an interlocutory basis is limited.

9

Coventry argues that we can and should exercise pendent appellate jurisdiction over the District Court's ruling on the standing question. Pendent appellate jurisdiction exists where an appealable issue is so "inextricably intertwined" with a nonappealable issue that one cannot resolve the former without addressing the latter. *DuPont*, 269 F.3d at 203. Because we have jurisdiction to review the order of the District Court compelling arbitration, Coventry argues, we should assert jurisdiction over the order denying Coventry's motion to dismiss for lack of standing. We disagree.

The doctrine of pendent jurisdiction is indisputably "narrow" and should be used "'sparingly' and only where there is a sufficient overlap in the facts relevant to both the appealable and nonappealable issues to warrant *plenary* review." *Id.* (emphasis in original); *In re Montgomery County*, 215 F.3d 367, 375-76 (3d Cir. 2000) ("Pendent appellate jurisdiction over an otherwise unappealable order is available only to the extent necessary to ensure meaningful review of an appealable order.") (internal quotation marks and citation omitted); *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 49-50 (1995) (warning that "loosely allowing pendent appellate jurisdiction would encourage parties to parlay *Cohen*-type collateral orders into multi-issue interlocutory appeal tickets.").

In *DuPont*, we considered whether we could review the denial of a motion to dismiss for lack of personal jurisdiction (an otherwise nonappealable order) pendent to our review of a denial of a motion to compel arbitration (an appealable order). We held that the jurisdictional question was not sufficiently intertwined with the merits of the appealable order, requiring us to "exercise restraint and forego review until the unrelated issue is appealable in its

10

own right." *DuPont*, 269 F.3d at 204 (citing *United States Fidelity & Guaranty Co. v. Braspetro Oil Serv. Co.*, 199 F.3d 94, 97 (2d Cir. 1999)).

As personal jurisdiction and standing are both threshold jurisdictional questions, our reasoning in *DuPont* applies here. Moreover, as Coventry has acknowledged, Coventry Reply Br. at n.1, two of our sister courts have declined to extend pendent appellate jurisdiction to adjudicate district court orders on standing. *Summit Medical Assoc., P.C. v. Pryor*, 180 F.3d 1326, 1334 (11th Cir. 1999) (finding that the appealable dismissal on Eleventh Amendment immunity grounds was not inextricably entwined with the non-appealable standing issue); *Triad Assoc., Inc. v. Robinson*, 10 F.3d 492, 496 n.2 (7th Cir. 1993) ("To further beat the jurisdictional dead horse, we do not find that [the non-appealable collateral standing issue is] 'inextricably entwined' with the appealable qualified immunity inquiry nor that there are 'compelling reasons' . . . that would justify invoking our rarely appropriate pendent appellate jurisdiction.") (internal citation omitted).

Like the Eleventh Circuit in *Summit Medical* and the Seventh Circuit in *Triad Associates*, the issues before us now are not sufficiently intertwined to support the exercise of pendent appellate jurisdiction. Regardless of how we adjudicate the standing question, we may still reach the arbitration question. Moreover, the factual underpinnings of the issues are distinct: the standing issue involves an inquiry into whether Griswold LLP remains in existence and can bring claims on behalf of the Trust as its sole beneficiary. In contrast, the question of arbitrability requires us to decide whether Griswold LLP, a non-signatory to the purchase agreement, can be bound to its arbitration clause because it

11

reaped the benefits of the contract. The two considerations are discrete and neither issue's determination is dependent upon the other.

In sum, we decline to exercise pendent appellate jurisdiction over the District Court's denial of Coventry's motion to dismiss because it is not inextricably intertwined with the denial of the motion to compel arbitration, nor is its review necessary to adjudicate the arbitrability issue.

III

We turn next to the District Court's order denying Coventry's motion to compel arbitration, which the parties and the Court agree is now subject to our review. FAA, 9 U.S.C. § 16(a)(1)(B) (providing that an appeal may be taken from an order denying a petition to compel arbitration); 28 U.S.C. § 1291.

We review decisions regarding the applicability and scope of arbitration agreements de novo, applying the same standard the District Court applied. *SBRMCOA, LLC v. Bayside Resort Inc.*, 707 F.3d 267, 270-71 (3d Cir. 2013) (citing *Kaneff v. Del. Title Loans*, 587 F.3d 616, 620 (3d Cir. 2009)). "A district court decides a motion to compel arbitration under the same standard it applies to a motion for summary judgment." *Kaneff*, 587 F.3d at 620. "The party opposing arbitration is given the benefit of all reasonable doubts and inferences that may arise." *Id.* (internal quotation marks and citation omitted).

In this appeal, it is undisputed that the purchase agreement contained a broad arbitration clause requiring the

12

parties to arbitrate any disputes arising out of the contract.[5] Courts generally apply a presumption in favor of enforcing arbitration clauses. *Preston v. Ferrer*, 552 U.S. 346, 349 (2008) (stating that the FAA established "a national policy favoring arbitration when the parties contract for that mode of dispute resolution"); *Dupont*, 269 F.3d at 194 (citing *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 104-05 (3d Cir. 2004) ("The FAA establishes a strong federal policy in favor of compelling arbitration over litigation.") (internal quotation marks omitted)). Coventry argues that because Griswold's claims "touch matters covered by [an arbitration clause in a contract] . . . 'those claims must be arbitrated.'" Coventry Br. at 39-40 (quoting *Brayman Construction Corp. v. Home Insurance Co.*, 319 F.3d 622, 626 (3d Cir. 2003) (internal quotation marks and citation omitted)).

The presumption in favor of arbitration does not extend, however, to non-signatories to an agreement; it applies only when both parties have consented to and are bound by the arbitration clause. *See United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960) ("[A] party cannot be required to submit to

---

[5] The arbitration clause encompassed "[a]ll disputes and controversies of every kind and nature *between the Parties* arising out of or in connection with this Agreement." JA 648 (emphasis added). By all accounts, the language in the arbitration provision is fairly standard and interpreted to apply broadly. *See Battaglia v. McKendry*, 233 F.3d 720, 727 (3d Cir. 2000) ("[W]hen phrases such as . . . 'arising out of' appear in arbitration provisions, they are normally given broad construction.").

13

arbitration any dispute which he has not agreed so to submit."); *Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999) ("If a party has not agreed to arbitrate, the courts have no authority to mandate that he do so."). Still, a non-signatory may be bound by an arbitration agreement if "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009); *see also Dupont*, 269 F.3d at 194 (a non-signatory may be bound to an arbitration agreement if "under traditional principles of contract . . . [the party is] akin to a signatory of the underlying agreement") (internal quotation marks and citation omitted).

Coventry seeks to compel Appellees to arbitrate under one such traditional contract principle: equitable estoppel. Both Georgia and Pennsylvania law allow non-signatories to be bound to an arbitration agreement. *See, e.g.*, *Price v. Ernst & Young, LLP*, 617 S.E.2d 156, 159 (Ga. Ct. App. 2005) (finding that "equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory.") (quoting *MS Dealer Svc. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)); *LaSonde v. CitiFinancial Mortgage Co., Inc.*, 614 S.E.2d 224, 226 (Ga. Ct. App. 2005) ("Federal law provides guidance for determining the circumstances under which a nonsignatory may be bound by such agreements. And as found by both Georgia and federal courts, the theory of equitable estoppel provides one basis for bringing a nonsignatory within an arbitration agreement.") (internal quotation marks and citation omitted); *Dodds v. Pulte Home Corp.*, 909 A.2d 348, 351 (Pa. Super. Ct. 2006) (holding that non-signatories to a contract

may be compelled to arbitrate "when there is an obvious and close nexus between the non-signatories and the contract or the contracting parties.").[6]

Estoppel "can bind a non-signatory to an arbitration clause when that non-signatory has reaped the benefits of a contract containing an arbitration clause." *Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 85 (3d Cir. 2010) (internal citation omitted). Equitable estoppel may apply under one of two theories, which we outlined in *Dupont*:

---

[6] Neither party relied on Georgia or Pennsylvania law either in the District Court, *see* Griswold's Memorandum in Opposition to Motion to Dismiss, D.E. 34 at 55-61; Coventry's Memorandum in Reply to Response to Motion to Dismiss, D.E. 38 at 68-75, or on appeal, *see* Coventry Br. at 45-55; Griswold Br. at 26-28. In a brief footnote in its reply brief, Coventry acknowledges that state law may be applicable. *See* Coventry Reply at 24 n.8. That belated and undeveloped argument is insufficient to raise a choice-of-law issue on appeal. *See Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 180 (3d Cir. 1995) (en banc) (observing that "choice of law issues may be waived").

Because we are satisfied that the Supreme Court's decision in *Arthur Andersen* did not overrule Third Circuit decisions consistent with relevant state law contract principles, we may rely on our prior decisions so long as they do not conflict with these Georgia and Pennsylvania state law principles. *See Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1130 n.5 (9th Cir. 2013) (holding that pre-*Arthur Andersen* federal decisions consistent with relevant state contract principles remain good law).

> First, courts have held non-signatories to an arbitration clause when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement. . . .
>
> Second, courts have bound a signatory to arbitrate with a non-signatory "at the non-signatory's insistence because of 'the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non[-]signatory's obligations and duties in the contract ... and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations.'"

269 F.3d at 199 (internal quotation and citation omitted). Here, the latter theory is inapplicable because our case involves a signatory (Coventry) attempting to bind a non-signatory (Griswold) to the arbitration clause, rather than the inverse.[7] *See id.* at 202 ("Appellants recognize that these cases bind a *signatory* not a *non-signatory* to arbitration, but argue that this is a distinction without a difference. They are wrong.") (emphasis in original).

---

[7] The other Appellants—Coventry Group, Montgomery Capital, Coventry Financial, and Reid S. Buerger—were non-signatories to the purchase agreement, and therefore cannot bind other non-signatories. *Invista*, 625 F.3d at 85 (stating that the party seeking to compel arbitration had "offer[ed] no authority for its contention that a non-signatory to an arbitration agreement can compel another non-signatory to arbitrate certain claims, and we have found none").

Coventry asserts that under the first theory of equitable estoppel—the "knowingly exploits" theory—a non-signatory may be bound by an arbitration clause if it "embraces the agreement and directly benefits from it." *Bouriez v. Carnegie Mellon Univ.*, 359 F.3d 292, 295 (3d Cir. 2004). "A non-signatory can 'embrace' a contract in two ways: (1) by knowingly seeking and obtaining direct benefits from that contract; or (2) by seeking to enforce terms of that contract or asserting claims [based on the contract's other provisions]." *Haskins v. First Am. Title Ins. Co.*, 866 F. Supp. 2d 343, 350 (D.N.J. 2012) (quoting *Noble Drilling Services, Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010) (internal quotation marks and citation omitted).

Equitable estoppel thus prevents a non-signatory from "'cherry-picking' the provisions of a contract that it will benefit from and ignoring other provisions that don't benefit it or that it would prefer not to be governed by (such as an arbitration clause)." *Invista*, 625 F.3d at 85 (internal citation omitted); *see also DuPont*, 269 F.3d at 200 ("To allow [a non-signatory] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act.") (internal citation omitted). A non-signatory cannot knowingly embrace the contract only to later "turn its back" on other provisions in the contract, such as an arbitration clause. *Dupont*, 269 F.3d at 199.

In *DuPont*, plaintiff was the parent company to a subsidiary that had signed a joint venture agreement with two other companies. The agreement provided that DuPont, a non-signatory, would "assist . . . in the balancing of foreign exchange during the [joint venture's] initial years" and "not take action detrimental to the interest or well-being of the

17

[joint venture]." 269 F.3d at 191, 192 (internal quotation marks omitted). DuPont and Rhodia, a signatory to the joint venture agreement, entered into three agreements related to the joint venture: a supply agreement, a license contract and an export sales agreement. *Id.* at 192.

When the joint venture failed, DuPont sued the parties, including Rhodia, alleging breach of an oral contract to fully perform the joint venture agreement. Rhodia sought to bind DuPont, a non-signatory, to the agreement's arbitration clause. We held that DuPont had not "embraced the Agreement itself during the lifetime of the Agreement," and that it had not "received any *direct* benefit under the Agreement." *Id.* at 200 (emphasis in original). Nevertheless, we expressed concern that DuPont's claim against Rhodia seemed to "(a) embrace[ ] the underlying Agreement and (b) require[ ] proof that Rhodia . . . ultimately breached the underlying Agreement." *Id.* at 201.

> What gives us some pause . . . is that a close examination of the Amended Complaint reveals that, at bottom, DuPont's claims arise, at least in part, from the underlying Agreement. . . . On the one hand, we must be careful about disregarding the corporate form and treating a non-signatory like a signatory. On the other hand, by alleging, albeit by virtue of a separate oral agreement, that Rhodia Fiber failed to secure loan guarantees, DuPont's claim against Rhodia Fiber implicates, at least in part, the very Agreement which DuPont repudiates to avoid arbitration. It is, however, that separate oral agreement that saves the day for DuPont because, wholly apart from whether Rhodia

18

> Fiber breached the Agreement, what is at the core of this case is the conduct and the statements of the appellants' representative [in making the oral promise].

*Id.* at 200-01. We thus held that DuPont was not bound to the arbitration clause because its claim did not hinge on whether Rhodia breached the joint venture agreement itself, but rather on an oral promise made outside of, albeit related to, the agreement.

In this sense, our case bears substantial similarity to *DuPont.* Here, what "saves the day" for Griswold is the fact that the alleged "Secret McGarrey Agreement" took place prior to and apart from the execution of the purchase agreement. Of course, that alleged fraud was related to the purchase agreement—it set the purchase price and, allegedly, the inflated, undisclosed broker's commission. But that alone is not sufficient to compel arbitration under the equitable estoppel doctrine: the claims must be based *directly* on the agreement. *Id.* Here, Appellees' Amended Complaint sufficiently alleged their injury without mention of the purchase agreement. Put simply, Appellees do not allege breach of the purchase agreement; they allege fraud antecedent to the purchase agreement.

Our relatively narrow application of the equitable estoppel exception is further reinforced by *Bouriez*, 359 F.3d at 294-96. Bouriez sued Carnegie Mellon University (CMU) for fraudulent inducement to enter a shareholders' agreement with Governors Technologies to fund projects at CMU. CMU then sought to compel arbitration against Bouriez based on a contract between CMU and Governors Technologies. The District Court ordered arbitration and we reversed, holding

19

that equitable estoppel did not support binding Bouriez, a non-signatory, to the arbitration clause as there was no evidence in the record to indicate that Bouriez had directly benefited from the contract. At most, the facts showed that Bouriez became a minority shareholder in Governors Technologies for the sole purpose of funding a CMU project; no evidence indicated that benefits from that project would flow to Bouriez directly. *Id.* at 295.

In *Bouriez*, we relied heavily on *Industrial Electronics Corp. of Wisconsin v. iPower Distribution Group*, 215 F.3d 677 (7th Cir. 2000), whose facts we declared "nearly identical" to those in *Bouriez.* 359 F.3d at 295. In *Industrial Electronics*, plaintiffs alleged that iPower fraudulently induced Industrial Electronics to enter into an association of other companies. Industrial Electronics sued, and iPower sought to compel arbitration pursuant to an arbitration clause in the franchise agreement between iPower and the association. *Id.* (citing *Industrial Electronics*, 215 F.3d at 679). The Seventh Circuit held that Industrial Electronics' claims were not based on the franchise agreement, nor had the corporation directly benefited from the agreement; therefore, it could not be bound by its arbitration clause. *Id.* (quoting *Industrial Electronics*, 215 F.3d at 681) ("A dispute that arises under one agreement may be litigated notwithstanding a mandatory arbitration clause in a second agreement, even where the two agreements are closely intertwined.").

As in *DuPont*, *Bouriez*, and *Industrial Electronics*, the fraudulent conduct alleged in this case—the "Secret McGarrey Agreement"—took place prior to and apart from the purchase agreement. Accordingly, the District Court properly found that Griswold's claims "would exist even if the contract containing the arbitration clause were void," and

20

are "independent of the Purchase Agreement at issue." JA4-5. In other words, because the "Secret McGarrey Agreement" was not incorporated into the purchase agreement, Appellees' claims do not allege a breach of that agreement and they are not bound by its terms. Therefore, Coventry cannot compel arbitration against Appellees, who never consented to the purchase agreement.[8]

---

[8] Because we find that Coventry cannot compel arbitration, we need not reach the question of whether Appellees would be required to arbitrate their claims on an individual rather than a class basis. However, because the parties request that we specify the answer to that question in this appeal, we will note that Appellees waived their class action claim on appeal, having neglected to properly brief the issue and having conceded as much at oral argument. Only in the very last footnote of their brief do Appellees discuss the issue of class status, and only abstractly:

> [T]he class plaintiff's individual standing, linked to his or her asserted claim, becomes automatically linked to the class claim. Having standing which a class representative shares with the members of a class is another way of saying that the class representative is a proper party to raise a particular issue common to the class . . . .

\* \* \*

For the reasons stated, we hold that we lack appellate jurisdiction to review the District Court's denial of Coventry's motion to dismiss. And we will affirm the District Court's denial of the motion to compel arbitration against Griswold and Griswold LLP.

---

Griswold Br. at 58. Aside from this footnote, Appellees make no attempt to reassert class status. Because they failed to brief the issue on appeal and conceded as much at oral argument, they have forfeited the argument. *See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived.").